The APACHE TRIBE OF THE MESCALERO RESERVA-
TION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–403L.

United States Court of Federal Claims.

March 5, 1999.

Gregory M. Quinlan, Alamagorda, New Mexico, attorney of record for plaintiff. Norman D. Bloom and Fettinger & Bloom, of counsel.

Glen R. Goodsell, Washington, D.C., with whom was Assistant Attorney General Lois J. Schiffer, for defendant. Daniel G. Steele, Washington D.C., of counsel.

## OPINION

HARKINS, Senior Judge.

The Apache Tribe of the Mescalero Reservation (plaintiff /Tribe) in a complaint filed June 15, 1992, asserts the United States breached its fiduciary duty to the Tribe by failing to properly manage, cut, and market its timber resources during the period March 9, 1979, to the date of the complaint. The complaint seeks compensation for damages incurred by the Tribe due to mismanagement of its timber properties. Supervision of the reservation was exercised by the Bureau of Indian Affairs (BIA), Department of Interior. Management of the timber properties primarily was the responsibility of BIA personnel in the Albuquerque Area Office and the Mescalero Agency.

The period of the Tribe's claim for damages due to breach of trust includes two forest management plans (FMP) that had been developed and implemented by the BIA. Each FMP provides for a ten year cutting budget (allowable annual cut or AAC) within a twenty year cutting cycle. It is based on a forest inventory. The AAC is the volume of timber that could be cut on commercial timberland during a year under a FMP aimed at sustained production of timber products. It is the cut that a forest can biologically sustain year after year.

The AAC in the 1979 FMP applied to the period January 1, 1979, to December 31, 1988. The AAC in the 1989 FMP, based on a continuous forest inventory (CFI), applied to the period January 1, 1989, to December 31, 1998.

*Procedural Status*

Proceedings, as is typical in Indian claims cases, to resolve the Tribe's assertions of breach of fiduciary duties have been complex and protracted. Defendant filed its answer on September 11, 1992. Subsequently, oral argument was heard on July 21, 1993, on defendant's motion to dismiss and on cross motions for summary judgment. An order on July 23, 1993, resolved the issues of subject matter jurisdiction and any bar of limitations under 28 U.S.C. § 2501 on the assertions of fiduciary failure due to mismanagement of timber resources during the period 1979–1988; summary judgment, however, was precluded by unresolved issues of material fact. The July 23, 1993, order is set forth in Attachment A to this opinion.

In an effort to reduce the size of the documentary record, and to facilitate resolution of disputed factual issues, the parties substituted stipulations as to the content and meaning of particular documents in lieu of filing contested documents in the record. This procedure was utilized in papers applicable to the cross motions for summary judgment, as well as to papers applicable to pretrial preparation. As a result the record at trial is an amalgam of stipulations by the parties, expert opinion on the intent and effect of the matters stipulated, and a dearth of documentary support on contested issues. These problems surfaced at a pretrial conference on June 19, 1996. Pretrial preparation materials were filed, or were in preparation, when the trial started on December 10, 1996.

Trial, limited to liability issues, was held in Las Cruces, New Mexico, and ended on December 18, 1996. Plaintiff called ten witnesses: two were operating officials of the BIA, with experience at the Mescalero Agency or Albuquerque Area Office; two were BIA employees who also were members of the tribal council; two represented local timber saw mill companies; and two were expert witnesses. Defendant relied upon the cross examination of plaintiff's witnesses and the testimony of its one expert witness.

The record also includes as joint exhibits extracts from nine depositions of potential witnesses taken during pretrial preparation. Eight were present or former BIA personnel called by plaintiff; defendant called the general manager of the Tribe's timber saw mill.

The reports and testimony of the three expert witnesses define the controlling elements that each party views relevant to the alleged breach of fiduciary obligations in BIA's management of timber resources on the Mescalero reservation (MAIR). Each report contains a curriculum vitae that sets forth in detail the education and works that establish the author's qualifications. Counsel stipulated as to the expert qualifications of all three experts, and there were no voir dire examinations. Plaintiff's two expert witnesses were recognized as qualified in the fields: (1) forestry, silviculture and forest development; and (2) forestry economics and marketing. Defendant's expert witness was recognized as qualified in the fields of forest management and forest economics.

Testimony during cross examination on data and conclusions in the report of defendant's expert witness leads to a determination that plaintiff's experts possessed a better understanding of forest management and forest economic concerns. Numerous errors in methodology by defendant's expert derogated from the validity of his ultimate conclusions.[1]

At the close of plaintiff's presentation, defendant reasserted its position on the motions to dismiss under RCFC 12(b)(1) and (4), and for summary judgment under RCFC 56, notwithstanding the provisions of the July 23, 1993, order. Defendant also moved for judgment under RCFC 52(c). Decision on that motion was deferred and is now pending.

Proof was closed on December 18, 1996, and a schedule was established for the presentation of information needed to clarify ambiguities in the record and for post trial briefing of legal issues. These matters were confirmed in a formal order closing proof filed December 30, 1996. The court adopted eleven of the 13 findings of fact which the parties had jointly recommended on February 26, 1996, pursuant to item 3 [joint recommendation for further proceedings] of the September 27, 1993, scheduling order.[2] Plaintiff was directed to file a separate document that explained statistical information on tables contained in designated plaintiff trial exhibits concerning a distinction between Tribal Government revenues and various tribal business enterprises. The court directed both parties to file separate documents that defined 20 terms as used by the BIA with a citation to the basis for such definition.[3] A schedule was established for post trial requested findings of fact and briefs on the law. Post trial briefing was completed on April 4, 1997.

*Facts*

1. On February 20, 1979, pursuant to Tribal Council resolution and request of its President, the Tribe's legal counsel, Fettinger and Bloom, was authorized to institute a suit against the United States for timber mismanagement, and timber expert Myron Wall was authorized to prepare technical data for the legal counsel. The petition (No. 89–79L), filed in the United States Court of Claims on March 8, 1979, except for the time periods covered, raised the identical claim for

1. One example: The Cooley Canyon Dripping Springs sale involved an ultimate sale of 7,349 million board feet (mmbf); it was advertised two times before it was sold. Defendant's expert concluded that the total that BIA had offered for sale was 15,698 mmbf. Another example: Appendix A of defendant's expert's report is captioned "An Evaluation of the Inspector General's audit report." The Inspector General's audit report dated August 28, 1991, included a memorandum dated June 17, 1991, from the Director of the Albuquerque Area Office on Recommendation 1 [allocate sufficient personnel and funds], Recommendation 2 [continue adequate timber sale training and experience] and Recommendation 3 [ensure the agencies offer for sale the AAC that the tribal councils desire to sell.] Defendants expert acknowledged he had not

looked at the report when he wrote his evaluation of the I.G. report.

2. These stipulated findings of fact were based on depositions taken during pretrial preparation, and confirmed by testimony at trial.

3. The terms to be defined were: (a) Annual Allowable Cut (AAC); (b) Gross AAC; (c) Net AAC; (d) Minimum Annual Cut; (e) "q" value and "q" ratio; (f) Basal Area; (g) Stocking Area; (h) Tribal Enterprise; (i) Uneven Age Management; (j) Even Age Management; (k) Managed Growth; (*l*) Net Growth; (m) Gross Growth; (n) Projected Growth; (*o*) Predicted Growth; (p) Continuous Forest Inventory (CFI); (q) Ratio Royalty; (r) Cutting Cycle; (s) Annual Cutting Budget; and (t) Diameter Breast Height (DBH).

timber resource mismanagement as claimed in this docket. The 1979 petition covered the period 1946 to March 8, 1979; the 1992 petition covers the period from March 9, 1979, to June 15, 1992. In 1982, the Tribe rejected defendant's offer to settle the case for $800,-000. In the 1979 case, the parties on August 27, 1984, filed a stipulation for settlement of all claims. The parties stipulated the judgment "shall finally dispose of all claims and demands which the claimants have asserted or could have asserted in this case." The stipulation attached the Tribe's December 6, 1983, approval of the settlement, signed by the Tribe's President, and a letter dated August 14, 1984, by the BIA that approved the settlement as "fair and just." The Tribe recovered $1,646,500, in the judgment entered August 28, 1984.

2. The 1979 FMP applied to the period January 1, 1979, to December 31, 1988; the 1989 FMP applied to the period January 1, 1989, to December 31, 1998. For accounting purposes, AAC timber cutting and sales are reported on a fiscal year basis. Tribal entities have various fiscal year ends. For years 1978 through 1981, Tribe's fiscal year ended on June 30; beginning in 1982, the Tribe changed to a September 30 fiscal year end. The AAC for the 1979 FMP was 17.9 million board feet (mmbf); the AAC for the 1989 FMP was 19.6 mmbf.

3. In 1982, a continuous forest inventory (CFI) was installed on the Mescalero reservation. Total reservation area, determined in the Geographic Information System (GIS) analysis, was 460,414 acres. The total forest area in 1982 was 392,862 acres. The forest area available for commercial use was 199,-757 acres; the commercial accessible forest area was 188,518 acres; and the commercial accessible regulated forest area was 143,892 acres. The AAC is calculated on the commercial accessible regulated forest area.

4. Limited management areas, in the CFI, are those areas administratively designated by the Tribe where other resources such as recreation, housing areas, and wildlife have higher value than timber management. Limited management areas include the area surrounding the Inn of the Mountain Gods, the Palmer Loop, Pena, Apache Summit, Blank Canyon, and Mescalero housing areas. The total 11,423 acres in the limited management areas are not in the AAC calculation for the 1989 FMP.

5. Previous inventories of forest resources on the Mescalero Reservation were based on different acreage than the CFI.

a) In 1937 the TC–BIA (Technical Cooperation–Bureau of Indian Affairs) Inventory was conducted to provide basic data on the forest resource for development of a management plan. The inventory was based on measurement conducted on a ten percent sample of the total acreage. This inventory measured a merchantable net volume of 600.5 million board feet on 183,-200 acres, an average of 3,278 bd ft/ac. The inventory served as the basis for the 1940 TC–BIA Forest Management Plan. The TC–BIA Plan determined an AAC of 5.74 mmbf.

b) In 1953 a comprehensive survey of the Mescalero Reservation was completed by Frank Hawksworth. The purpose of the survey was to determine the abundance of and damage caused by dwarf mistletoe, to furnish information on the need for and nature of control measures, and to modify existing management plans in infected areas. The survey collected basic forest inventory data and detailed mistletoe infection information on 4,013 1/10–acre plots. The survey measured a merchantable net volume of 475.6 million board feet on 188,-942 acres, and average of 2,517 bd ft/ac. This inventory served as the basis for the 1955 FMP which specified an AAC of 15 mmbf.

c) An inventory was conducted to provide information for a response on a request for a proposed timber sale of 200 mmbf over a ten year period. The Timber Inventory Report completed in September 1963 determined that there was a gross volume of 619 mmbf and a net volume of 514 mmbf on 186,00 acres, an average of 2,763 bd ft/ac (net). This inventory helped support a tentative AAC of 22 mmbf.

d) In 1978 a forest inventory was conducted which was to serve as the basis for determining the AAC for the 1979–1988 Mescalero Apache Indian reservation

FMP. During the summer of 1978, 342 temporary 1/5–acre diamond shaped plots were installed on a systematic 70 × 70 chain grid within the commercial forest component. Each plot contained two 1/20–acre subplots. A forest inventory analysis was completed in March, 1982. From the inventory it was determined that the measured net growth rate was 94,674 board feet per acre per year and the projected net growth rate was 110,565 board feet per acre per year. The Austrian Formula was used to calculate a gross AAC of 22.1 mmbf with a net AAC of 17.9 mmbf. The AAC was based upon a commercial forest acreage of 161,783 acres.

6. The 1979 FMP and the 1989 FMP each outlined the overall direction for the management of the Tribal forest for a ten year period. Formulation of an FMP includes an action plan and is supported by an environmental assessment, a forest inventory analysis, and a forest history.

The 1979 FMP was prepared and completed by employees of the BIA. On September 11, 1979, the Tribe contracted with timber expert Myron Wall to review and critique a draft of the FMP. Myron Wall was not involved in any capacity during the preparation of the BIA draft. Myron Wall's final report of the review and critique was delivered on January 8, 1982. The most important element in the critique of the draft 1979 FMP was Wall's estimation of the Allowable Annual Cut sustainable by the Mescalero Apache Forest during the period 1979–1998. The results from the Wall study and those prepared by BIA were:

|  | Wall | BIA |
| --- | --- | --- |
| Gross AAC | 14.5 mmbf—14.8 mmbf | 22.4 mmbf |
| Net AAC | 11.8 mmbf—12.0 mmbf | 18.1 mmbf |

The draft 1979 FMP was not approved by the Tribe. Subsequently, the draft was revised to establish a net AAC of 17.9 mmbf. The final 1979 FMP was not approved by the Tribe.

7. The purpose of the CFI installed in 1982 was to determine the yield capacity of the forest, to measure forest trends and to serve as a basis for refining the AAC—the maximum amount of timber which can be harvested annually on a sustained yield basis. The inventory analysis would serve as the basis for developing the 1989–1998 FMP.

The CFI actually measures only a small portion of the Mescalero forest. The inventory procedures are designed so as to measure a representative sample and calculate an accurate estimate of the growth and volume characteristics of the forest. A statistical analysis is computed to determine the sample precision of the CFI plot data evaluated in the inventory analysis. The CFI was designed for a target sampling error of ±5% with a confidence level of 67% for board foot volume in commercial tree species 9.0 inches diameter breast high (dbh) and larger. The measured standard error percent for total board foot volume was 4.8% in the regulated forest.

During Fall 1982, 550 1/5–acre circular plots were installed on a systematic grid using UTM coordinates (1,000 meter grid). All plots were to be installed in commercial forest types. The 550 plots were selected randomly out of a possible 819 plot locations.

The inventory was based upon 1978 management units: 1) Burn; 2) Unreserved; and 3) Reserved. Plots were also classified by cover types. All live and mortality trees 5.0 inches and larger were measured on the 1/5–acre plot. Each plot also contained two minor plots. The first minor plot consisted of a 1/20–acre plot in the northeast quadrant on which saplings were recorded and tree growth, height and form class were measured. The second minor plot consisted of a 1/100–acre circular plot superimposed over the plot center on which established seedlings were recorded.

8. The intent of the CFI was to install all plots in commercial forest types. An initial evaluation of plot data revealed: (1) that several plots were actually installed in woodland types; (2) that some plots were located in stands which are designated as unregulated stands and not considered part of the regulated forest; (3) some plots were also located in areas now designated as the limited management areas. A further evaluation of plot data was conducted. Plots were field checked when necessary to verify plot loca-

tion and conditions. Based upon this analysis, 133 of the plots measured in the CFI were included in the Regulated Forest AAC calculations.

9. The *Austrian Formula* was used by the BIA to calculate the AAC. Basically, the formula is a relatively simple device to state what is intended to be accomplished during the period of developing the desired or regulated level of growing stock. Information derived includes: measured volume per acre at the end of the growth measurement period; measured net growth, which is calculated by subtracting mortality from gross growth (accretion plus ingrowth); and projected growth, net increment for a period forward in time equal to the growth measurement

period. Other elements of the CFI include: predicted growth, an estimate of future growth after the forest is regulated; current stand conditions in a forest managed on an uneven management basis; the maximum tree size goal between cutting cycles; and the adjustment period, time required to convert the present forest to conditions required in the regulated forest.

10. There are several significant differences between the 1978 inventory and the 1982 CFI. The AAC increased by 1.7 mmbf from 17.9 to 19.6 mmbf. The 1978 inventory involved the measurement of 342 temporary plots. The CFI involved the installation of 550 permanent plots. The following table summarizes some of the differences:

|  | 1978 Inventory | 1982 Inventory | Change |
|---|---|---|---|
| Maximum tree size goal (in) | 18 | 18 | 0 |
| Adjustment period (years) | 60 | 40 | −20 |
| Gross AAC/ac (bd ft/ac/yr) | 136.4 | 172.7 | +36.3 |
| Regulated Acres | 161,783 | 136,697 | −25,086 |
| Gross AAC (mmbf) | 22.1 | 23.5 | +1.4 |
| Avg Defect (%) | 18.9 | 17.1 | −1.8 |
| Net AAC (mmbf) | 17.9 | 19.6 | +1.7 |

11. The 1979 FMP was developed under a theory of uneven age management to maintain a continuous sustained yield of timber. The BIA attempted to manage the timber resources on the MAIR pursuant to the 1979 FMP. The Tribe did not plan, produce, or approve, the 1979 FMP. The 1979 FMP included an analysis of the marketing area and the market potential for the MAIR timber. The 1979 FMP was developed based on the idea that the primary market for the MAIR timber included Southeastern New Mexico, West Texas, and metropolitan Albuquerque. Additional markets were thought to exist in the rest of New Mexico, the rest of Texas, portions of the Mid–West, Arizona, and Southern California. The AAC in the 1979 FMP was established by the BIA to promote sustained yield of the MAIR forest indefinitely into the future.

12. When the AAC is computed, the number includes an analysis of market conditions

available or likely to be available at the time the AAC is effective. Computation of the AAC for the 1979 FMP was based on an analysis of market conditions available, or estimated to be available, during the applicable ten year period. Had the AAC under the 1979 FMP been reached, growth rate in the forest for future marketable trees would have increased.

13. Timber sale shortfalls, in mmbf, on the MAIR for the fiscal years 1979 through 1988 were:

| Fiscal Year | AAC | Timber Sold | Shortfalls |
|---|---|---|---|
| 1979 | 17.9 | .856 | 17.044 |
| 1980 | 17.9 | 4.715 | 13.185 |
| 1981 | 17.9 | 11.537 | 6.363 |
| 1982 | 17.9 | 14.256 | 3.644 |
| 1983 | 17.9 | 6.497 | 11.403 |
| 1984 | 17.9 | .755 | 17.145 |
| 1985 | 17.9 | 5.471 | 12.429 |
| 1986 | 17.9 | 5.659 | 12.241 |
| 1987 | 17.9 | 1.069 | 16.831 |
| 1988 | 17.9 | 7.094 | 10.806 |
| Total | 179 | 57.909 | 121.091 |

14. Under the 1979 FMP, the AAC for the ten year period totaled 179 mmbf. The 121.091 mmbf shortfall amounted to 67.6 percent.

15. The only contracts prepared and offered by the BIA during the 1979 FMP were for large amounts of timber ranging from 1 mmbf to 33 mmbf to be harvested in 1–3 years. The two contract sales for timber under the 1979 FMP were too large for small sawmills in the area. The BIA never attempted to prepare and offer timber contract sales to the small sawmill facilities in the area. Sawmills gear their capacity for timber depending upon what is available in the timber market. The BIA could have sold timber contracts to small facilities in the area. A market existed for the sale of more timber than the BIA offered from the Mescalero Forest during the period of 1979 to 1988. Local timber purchasers could have bid at appraisal stumpage prices if smaller sales had been offered.

16. One sale of an entire annual cut for one year is not possible, but achieving the AAC might have been possible with multiple smaller sales. The BIA had the responsibility to see that the actual cut under their control be made. The BIA made no effort to ascertain the available market or to sell in that market. Failure to harvest was not prudent in regards to management and production value of timber in the Mescalero Forest. The value of the investment in a forest decreases without management.

17. White Sands Forest Products is a timber mill located in Alamogordo, New Mexico. White Sands purchases its timber from three sources: the Forest Service, private suppliers, and occasionally from plaintiff. During the 1979 FMP period, White Sands Forest Products was milling 15–16 mmbf a year log scale. White Sands Lumber Company could have processed an additional 8–10 mmbf of timber per year from 1979 to 1988 had it been offered. White Sands Lumber Company had to bid on sales from other forest areas approximately 220 to 300 miles away because there was not enough timber being offered locally.

18. Chippeway Lumber is located in the Lincoln National Forest, approximately 40 miles from the Mescalero Forest. Since 1974 the mill has had the capacity to cut approximately 1 mmbf per year. Under the time periods relevant to this case, Chippeway was never contacted by the BIA to determine if it wanted to purchase the Tribe's timber. During the 1970's and 1980's Chippeway was only processing about .5 mmbf of timber per year. Chippeway Lumber could have handled timber contracts of up to one million plus board feet log scale per year. Chippeway Lumber has never had a problem with market sales.

19. The 1979 FMP urged the creation of a Tribal enterprise which would be a timber mill capable of handling the AAC. In 1981 the Tribe authorized a study of the feasibility of establishing a tribal timber mill. Two years later, in 1983, the Tribe authorized negotiations for financing the construction of a tribal timber mill. In 1985, pursuant to Tribe authorization, a loan was obtained to develop a tribal timber mill. In 1987 the Tribe and the tribal timber mill executed a contract providing that before the BIA could place the Tribe's timber for sale on the public market, the tribal mill would have the right of first refusal of any sale. The Tribe's mill had the right of first refusal on any timber sales from the Tribe's forest. If the Tribe refused a timber sale prepared by the BIA, the sale could then be offered by the BIA on the open market.

20. The first Mescalero sawmill (Apache Timber Products Enterprise (ATP)) started operating in 1987. The ATP sawmill never succeeded in cutting the AAC during the 1979 FMP period. When the BIA wanted to put together a large sale in a hurry, they could and did bring in extra foresters. The Enterprise sale was put together for the Tribal Timber Mill, now renamed Mescalero Forest Products (MFP). Extra foresters were brought in from the Albuquerque Area BIA Office to handle the pre-sales planning of the Enterprise sale. After the Enterprise sale was put together, the extra foresters all left the Mescalero Apache Reservation.

21. During the fiscal years 1978 through 1988, total Tribal government revenues were $54.4 million. Tribal government revenues

include governmental-type service activities, and do not include any Tribal enterprise activity. Revenue from Tribal enterprises [Inn of the Mountain Gods, Ski Apache Resort, Tribal Store, Tribal Lounge, Bingo] during fiscal years 1978 through 1988 totaled $119.3 million, and gross profits totaled $106.8 million. Net income from Tribal government revenues and Tribal enterprises during fiscal years 1978 through 1988 totaled $14.2 million.

## DISPOSITION

■ Notwithstanding the Tribe's request for a general accounting from March 9, 1979, to June 15, 1992, the date of the complaint, the central issue in the Tribe's claim is whether the United States, acting through the BIA, breached its fiduciary duty during the period of the 1979 FMP (January 1, 1979, through December 31, 1988) by mismanagement of the Tribe's timber properties.

During the 1993 proceedings on defendant's motion for summary judgment and during the 1996 trial proceedings, the parties presented data and argument relative to the 1989 FMP period, January 1, 1989, to December 31, 1998. Any claim for mismanagement of defendant's silvicultural obligations during the period of the 1989 FMP could not be made prior to its expiration on December 31, 1998. Similarly, a claim for mismanagement of defendant's obligations under the 1979 FMP could not be established until the end of the ten year cutting budget on December 31, 1988. The Tribe could not attain knowledge of whether a claim existed until after the ten year cutting budget expired.

There is no question that the statutes and regulations applicable to the Tribe's timber resources during the period of the 1979 FMP establish a specific fiduciary relationship and define defendant's fiduciary responsibilities. The Tribe did not elect, pursuant to the Indian Self–Determination and Education Assistance Act,[4] to manage its own resources.

When forestry functions are not contracted by particular Indian tribe under the Act, the Tribal forest is managed by the BIA, pursuant to a BIA-generated FMP. At all times during the ten year cutting budget, defendant was subject to the highest degree of fiduciary obligation to the Tribe in the care and management of the Tribe's property and property rights. The Tribe, at all times pertinent to this action, has relied to its detriment on the technical expertise and advice of defendant, as trustee, in all matters relating to timber management.

Defendant's fiduciary duty as trustee has been interpreted and expanded in extensive federal legislation and regulation.[5] The Federal Timber Management Statutes, 25 U.S.C. §§ 406, 407, and 466, impose a specific fiduciary duty on defendant in its management of forested Indian lands. In *Mitchell II*,[6] the Supreme Court described the statutory and regulatory structure as follows:

> The Secretary of the Interior has broad statutory authority over the sale of timber on reservations. See 25 U.S.C. §§ 406, 407. Sales of timber "shall be based upon *a consideration of the needs and best interests of the Indian owner and his heirs*," § 406(a), and the proceeds from such sales *are to be used for the benefit of the Indians or transferred to the Indian owner,* §§ 406(a), 407. Congress has directed the Secretary *to adhere to principles of sustained-yield forestry on all Indian forest lands under his supervision.* 25 U.S.C. § 466. Under these statutes, the Secretary has promulgated detailed regulations governing the management of Indian timber. 25 CFR pt. 163 (1983). The Secretary is authorized to deduct an administrative fee for his services from the timber revenues paid to Indian allottees. 25 U.S.C. §§ 406(a), 413.

463 U.S. at 209, 103 S.Ct. 2961.

The Department of the Interior—through the BIA—exercises literally daily supervision

---

4. Pub.L. No. 93–638, 88 Stat 2203 (1975), codified as amended at 25 U.S.C. §§ 450–450n (1988).

5. *See* 25 U.S.C. §§ 196, 406, 407, 413, 466; 16 U.S.C. §§ 583, 594; 18 U.S.C. §§ 1853, 1855, 1856; 25 C.F.R. §§ 163.1–164.12 (1992).

6. *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

over the management of the Tribe's timber. 463 U.S. at 222, 103 S.Ct. 2961. The BIA has control of every stage of timber management by virtue of its power to: (a) manage the timber resources in accordance with the principles of sustained yield management;[7] (b) sell, on the open market, excess timber when the volume available and for harvest is in excess of that which is being developed and/or utilized by the local Indian forest enterprise;[8] (c) prevent loss of values resulting from insects, diseases, or other catastrophes;[9] (d) prepare and revise forest management and operating plans as needed;[10] (e) maximize benefit to the Indian owner;[11] and (f) generally manage and protect tribal forest lands "to the extent that such action is in the best interest" of the Indians.[12]

The Supreme Court concluded that the Government's control of Indian forest property contained the necessary elements of a common-law trust.

> Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."

> Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.

463 U.S. at 225, 103 S.Ct. 2961 (citations omitted).

Defendant argues that the 1979 FMP was never approved by the Tribe, and therefore the BIA never had the duty to cut and sell the AAC of 17.9 mmbf. Further, defendant argues that the Tribe's approval in 1990 of the 1989 FMP without requiring prior timber harvest shortfalls be made up during the period 1989 to 1998, constitutes a waiver of any claims to a shortfall in the 1979 FMP period.

Defendant characterizes the 1979 FMP as a "draft" because it was never approved by the Tribe. Defendant points to language in the FMP conclusion and recommendations that "17.9 mmbm [sic] be adopted as the operating allowable annual cut for the plan period 1979–1988 inclusive, *subject to acceptance by the Mescalero Appache Tribe*."[13]

The 1979 FMP could not have been put in final form until a forest inventory had been completed. The 1978 forest inventory analysis was completed in March, 1982. The 1979 FMP in final form was ready for submission to the Tribe by September, 1982. The Tribe's timber expert, Myron Wall, delivered on January 8, 1982, his final critique of the draft 1979 FMP. At that time the BIA's net AAC was 18.1 mmbf. It is clear that the "draft" was revised subsequently to establish 17.9 mmbf as the BIA's final net AAC.

That the 1979 FMP was not completed until September 1982, is evidenced further by the shortfall data. An AAC of 17.9 mmbf for the ten year period would result in a total of 179 mmbf over the plan period. The BIA in the 1979 FMP, however, states: "The attached ten year cutting budget, TABLE IV–14, page IV–190, is intended to meet the AAC of 17.9 million board feet (MMBM) [sic]

---

7. 25 C.F.R. at § 163.4. The current General Forest Regulations are found in 25 C.F.R. §§ 163.1–.27 (1992). Some of plaintiff's allegations date back to the previous General Forest Regulations found in 25 C.F.R. §§ 141.1–.23 (1979).

8. 25 C.F.R. at § 163.3(e).

9. 25 C.F.R. at § 163.7(b).

10. 25 C.F.R. at § 163.4.

11. *Id.*

12. 25 C.F.R. at § 163.3(g).

13. 1979 FMP p. V–25 (emphasis supplied).

by harvesting 141.7 MMBM [sic] during the management period (1979–1988)." [14]

The 141.7 mmbf total schedule cut was limited to the actual sales during years 1979, 1980, 1981, and 1982, that totaled 34.3 mmbf.[15] Years 1983 to 1988 were future sales estimated at 17.9 mmbf, for a total of 107.4 mmbf.

The BIA prepared, completed, and used the 1979 FMP pursuant to its obligations to manage the Tribe's forest property. The phrase "subject to acceptance by the Mescalero Apache Tribe" does not signify that the 17.9 mmbf AAC did not exist because the plan was not approved by the Tribe, nor that the 1979 FMP was simply an unapproved and inoperative "draft." Approval of the 1989 FMP stands alone as a separate element of forest management. The new AAC number takes past shortfalls into account, with measurements of growth and actual harvest figures factored into the new AAC. Failure to include remedies for shortfalls during the 1989 FMP cutting period does not constitute a waiver of the BIA's trust responsibilities.

Defendant relies upon the discussion of the continuing claims doctrine in the July 23, 1993, order (Attachment A) as support for its motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim on which relief can be granted. Defendant views the July 23, 1993 order as being the law of the case. Defendant contends that all pre-June 15, 1986, actions and representations by defendant and its BIA agents that gave rise to a cause of action for failure to meet the AAC under the 1979 FMP are time-barred.

The July 23, 1993, order addressed defendant's motion to dismiss a complaint that alleged mismanagement of the Tribe's timber resources. Five categories of fiduciary duties were identified, beach of which, if proven, would be compensable. The order explains that, under the continuing claims doctrine, the bar of limitations would not apply to any category that was shown to be breached after June 15, 1986. Accordingly, defendant's motion to dismiss was denied.

Subsequent to the July 23, 1993, order, the scope of the continuing claims doctrine has been illuminated by the United States Court of Appeals for the Federal Circuit in *Brown Park Estates*.[16] In that case, the court analyzed military and civilian pay case precedent from which the continuing claim doctrine had evolved, and concluded: "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." A claim based upon a single distinct event, although it may have continued ill effects later on, is not a continuing claim. 127 F.3d at 1456.

In cases when a continuing claim was found, such as the government's failure to make overtime payments after overtime had been performed, each failure to pay constituted an independent violation of the terms of a statute or regulation that accrued when that particular nonpayment occurred, independent of the accrual of the nonpayments of overtime. In cases where the continuing claim doctrine was found not to apply, such as the government's failure to pay survivor annuity benefits to a widow, or the failure to pay after an allegedly illegal discharge from the Army, the government's failure to pay the annuity or wages was a violation of statute or regulation that accrued all at once, at one point in time. The widow's claim accrued the day of her husband's death, the plaintiff's claim for wrongful discharge accrued upon removal from the Army. Inasmuch as in each case the claim accrued more than six years before the complaints were filed, the bar of limitations applied, notwithstanding the adverse effects of continued nonpayments after the accrual dates. Plaintiff's alleged later "wrongs," such as nonpayment of annuities or wages, were not independently accruing violations of any statutes

---

14. 1979 FMP p. IV–189.

15. Cooly Canyon–Dripping Springs, and permits and small sales.

16. *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449 (Fed.Cir.1997). The case involved bar by the statute of limitations on claims that arose under contracts by HUD in its Section 8 housing assistance program.

or regulations in themselves, but rather were merely damages resulting from the single earlier alleged violation by the government—such as lack of notification or wrongful discharge—that accrued outside the statute or limitations period. 127 F.3d at 1457.

The continuing claims doctrine, as refined in *Brown Park Estates*, does not apply to the Tribe's claim in this case for breach of fiduciary obligations. Defendant's breach involves obligations that extend through the entire ten year AAC of the 1979 FMP.

One of the cases analyzed in *Brown Park Estates*, was a 1986 decision on accounting (*Mitchell VI* ) in the *Mitchell* litigation sequence.[17] That Indian claims case involved the bar of limitations to a stumpage claim (failure to obtain fair market value for timber sold over the period 1920 to 1986) and a regeneration claim (failure to meet forestry requirements to introduce regeneration on cut over or burned over land). The Federal Circuit contrasted BIA obligations respecting regeneration and stumpage. The duty to replant was an ever-present one, the non-performance of which was viewed as giving rise to a series of actionable breaches. The duty to obtain adequate timber prices, however, arose at a specific point in time, namely, when the timber was sold. BIA's failure to obtain the full price occurred at that time, and failures to obtain adequate prices in subsequent sales was not a continuation of the original wrong, but merely a continuing effect of that wrong. The plaintiffs could not pursue their stumpage claims with respect to timber harvested before the six-year limitations period, but that they could go forward with regeneration claims with respect to those harvests.

The Indian stumpage claim analyzed in *Brown Park Estates* is not apposite to the Tribe's assertion that the BIA mismanaged the forest by failure to meet the cutting

budget of 17.9 mmbf AAC during the 1979 FMP. The stumpage claim in *Mitchell VI* concerned a failure to obtain fair market value for timber sold. The Tribe claims the failure to meet the 17.9 mmbf AAC constitutes mismanagement by the BIA that extends through the entire ten year cutting budget period of the 1979 FMP. The statute of limitations does not bar the Tribe's claim for undercutting the 17.9 mmbf AAC in the years 1979 through 1988.

Both parties rely heavily on a decision in the accounting phase in the sequence of cases on the Navajo tribal claim after that action was transferred on termination of the Indian Claims Commission.[18] Defendant cites to *Navajo* as support for its argument that the AAC is not a requirement but a goal, and that defendant has discretion to determine how much timber should be harvested each year. Defendant argues that because there was a limited market for plaintiff's timber during the early 1980's, and limited timber mill capacity in the area, it would not be prudent for defendant cut the 17.9 mmbf AAC. Defendant rejects the cutting budget in the 1979 FMP because the court in *Navajo* found the AAC in that case was not a reasonable figure. Plaintiff argues the 17.9 AAC was a reasonable figure, that the court in *Navajo* merely found in the particular circumstances of that case it was not reasonable, and that there was a ready market for timber far beyond the 68.391 mmbf that was harvested and sold during the cutting period of the 1979 FMB.

In *Navajo* the court found that:

[g]iven all of the above factors, the court finds that an ordinary prudent man . . . would not have cut the entire allowable cut in the Navajo forest each year from 1921 to 1962, and therefore defendant cannot be held to be required to have cut that amount. On the other hand, the court is of

17. *Mitchell v. United States*, 10 Cl.Ct. 63 (1986), modified on reconsideration, 10 Cl.Ct. 787 (1986). The history of this case includes five reported decisions during the period 1972 to 1983. 10 Cl.Ct. at 65, n. 1.

18. *Navajo v. United States*, 9 Cl.Ct. 336 (1986). The actions were transferred on January 3, 1977 to the United States Court of Claims pursuant to

the Act of October 8, 1997, 90 Stat.1990, 25 U.S.C. § 70v (1976). In the Claims Court 1986 decision, the Navajo Tribe sought to recover damages on the ground that the United States breached fiduciary duties and obligations it owed the Tribe in the management and operation of the Tribe's forest land at various times during the period 1880 to 1986. 9 Cl.Ct. at 340.

the view that there was a "reasonable" harvest figure for each year and that defendant abused its discretion, i.e., acted unreasonably, by not seeing that this amount was harvested.

9 Cl.Ct. at 376.

A great many facts distinguish the Mescalero Tribe's claim from the facts in *Navajo*. In *Navajo* the time period involved was from 1921 to 1962. This period included conditions that prevailed in the Great Depression, which were unforeseen and which resulted in devastating effects on the nation's economy. This event all but wiped out the timber market for long periods of time. The time factor is important because many things have changed since then. Technology was a bar to a full harvest during this period. It would have been technologically impossible in many years, for the defendant to meet the AAC on the Navajo reservation. That is not the case in the ten year cutting period of the 1979 FMP. The record does not suggest that technological reasons precluded the BIA from meeting the 17.9 AAC.

In the *Navajo* case, much of the harvest shortfall was caused by the breach of a third party to fulfill a contract. There is no suggestion in the record that such an excuse is present in this case.

Another event which effected the timber harvest in *Navajo* was World War II, which increased the demand for timber. This event also caused the timber market to fluctuate greatly. No comparable disturbances to the economy occurred during the 17.9 AAC period.

The 1979 FMP was written based upon the BIA's study of plaintiff's forest, the BIA's study of current market conditions, and on the BIA's understanding of plaintiff's desires. There is no doubt that plaintiff desired to sell its timber. Every resolution prepared and presented to the Tribe by BIA which dealt with timber sales was passed.

The United States has been responsible since 1910, for the care, management, development and harvesting for sale of timber on the MAIR. One of the government's objectives in managing the Tribe's timber resources is to attain in commercial forest lands a perpetually productive state. 25 C.F.R. § 163.3(a). Another objective is to regulate the commercial forest in a manner which will insure method and order in harvesting the tree capital, so as to make possible continuous production and a perpetual forest business. 25 C.F.R. § 163(c). The economic exploitation of timber and the goal of perpetual productivity are not easily reconcilable.

The BIA personnel produced the 1979 FMP and outlined the overall direction for management of the Tribal forest for a ten year period. The 1979 FMP was developed under a theory of uneven age management to maintain a continuous sustained yield of timber. The action plan in the FMP was supported by a history of the forest, an environmental assessment and an analysis of the forest inventory. The purpose of the inventory is to determine the yield capacity of the forest, and to serve as a basis for refining the AAC-the maximum amount of timber which can be harvested annually on a sustained yield basis.

Over time, inventories of forest resources on the Mescalero reservation show variations in total forest regulated acreages, sample sizes, AAC mmbf, and related FMP.

| Inventory Year | Sample | Regulated Forest Acreage | AAC mmfb | FMP |
| --- | --- | --- | --- | --- |
| 1937 | 10% total acreage | 183,200 | 5.74 | 1940 |
| 1953 | 4013 1/10–acre plots | 188,942 | 15 | 1955 |
| 1963 | n.a. | 186,000 | 22 | 1960 (Revision) |
| 1978 to 1982 | 342 1/5–acre plots with 2 1/20–acre subplots | 161,783 | 17.9 | 1979 |
| 1982 | 550 1/5–acre plots with 2 1/20–acre subplots; 133 plots (with subplots) were used | 136,697 | 19.6 | 1989 |

Changes in inventory sampling technique and variations in regulated forest acreages reflect historical development and refinement of the content and meaning of the AAC. At the same time, the AAC was affected by the growth of limited management areas designated by the Tribe. In those areas, other resources such as recreation, housing areas, scenic vistas, and wildlife protection have a higher value than timber management. Limited management areas are not included in the AAC.

Revenues from Tribal enterprises located in the limited management areas also were developing during those periods. By fiscal year 1978 through 1988 revenues from such Tribal enterprises totaled $119.3 million, and gross profits totaled $106.8 million.

Neither the limited management areas nor the revenues from Tribal enterprises located therein are relevant to the calculation of the AAC during the period 1979 through 1988. The only Tribal enterprise related to the plaintiff's claim for mismanagement of timber resources and to harvesting the AAC was the Tribal timber mill (MFP). The Tribe's mill had the right of first refusal on any timber sale prepared and offered by the BIA. If the MFP refused a timber sale proposed by the BIA, the sale could then be offered by the BIA on the open market.

The AAC calculation for the ten-year cutting budget in the 1979 FMP included consideration of the cut level in the prior ten-year period. The AAC total for each year reflects the amount of timber BIA intended to be cut annually. During years 1979 through 1988, the 17.9 mmfb yearly BIA goal was not attained in any year. A total of 57.909 mmbf were sold during the ten year period; the shortfall totaled 121.091 mmbf, which amounted to 67.6 percent of the 179 mmbf total for the period.

Defendant agrees with plaintiff's statement that "defendant has the duty of a fiduciary to properly and prudently manage the [Tribe's] timber resources on a sustained yield basis." Defendant contends, however, that plaintiff must prove liability by showing BIA failed to prudently manage the Tribe's timber resources during the cutting period of the 1979 FMP. Such a showing, defendant argues, would require analysis of BIA management by taking into account the economic situation during the cutting period, realities of limited marketing conditions, and the period for the construction of the Tribe's timber mill, with attendant obstacles to the BIA in its efforts to achieve the AAC under the 1979 FMP.

Defendant does not give effect to the extent of the BIA control over timber operations on the MAIR in the 17.9 AAC period and the factors that were used to establish the AAC for the 1979 FMP. The 1979 FMP was planned and produced solely by BIA personnel; BIA had complete control of the management of timber resources. All sales of timber originated in the BIA. Tribal resolutions that applied to sales made, or to sales approved, were written by the BIA and presented to the Tribe for signature. The Tribe did not have the capacity to plan or produce the 1979 FMP. The Tribe did not plan, produce or approve the 1979 FMP. The 1979 FMP included an analysis of the marketing area and the market potential for MAIR timber. It was developed on the basis that the primary market for MAIR timber included southeastern New Mexico, west Texas, and metropolitan Albuquerque. Additional markets were thought to be available. The BIA established the AAC in the 1979 FMP to promote sustained yield from the MAIR forest indefinitely into the future.

Computation of the AAC for the 1979 FMP included an assessment of markets available for timber from the Mescalero reservation during the ten-year 1979–1988 period. The two contract sales of large amounts of timber during the relevant period exceeded the capacities of available small sawmills. BIA never attempted to prepare and offer contract sales to the small sawmills in the marketing area. A market existed for the sale of more timber than BIA offered from the Tribe's forest during the 1979–1988 period.

The BIA was responsible to see that the actual cut be made of the timber under their control. In operation, the BIA made no effort to ascertain the available market, or to sell in that market. BIA's failure to harvest was not prudent in the management of the Tribal forest. As a result, timber operations on the Tribal forest did not produce revenues that were available in existing markets. The shortfall of 121.091 mmbf during the 1979–1988 period is a reasonable measure of BIA's mismanagement.

It is apparent that under the 1979 FMP, defendant failed to manage prudently the Mescalero Forest and obtain for the Tribe the most income from its forest. While defendant has discretion in determining how much timber to harvest, defendant abused its discretion in management decisions that resulted in failure to realize the cutting budget in the 1979 FMP.

The documentary information produced and testimony elicited at trial, establish that defendant, through BIA operations, breached fiduciary obligations owed to the Tribe during the 1979–1988 cutting period. At trial, limited to liability issues, the Tribe prevailed on its mismanagement claim relative to the 17.9 AAC in the 1979 FMP.

On August 28, 1991, the Inspector General of the Interior Department reported to the Secretary on the final audit report captioned: "Selected Forestry Operations of the Albuquerque Area Office, Bureau of Indian Affairs." Plaintiff asserts it was unaware of a potential mismanagement claim under the 1979 FMP until it reviewed the I.G. report.

The 1991 I.G. report concluded that three tribes within the Albuquerque area office did not receive potential timber sales revenues in fiscal years 1980 through 1989. With respect to the Mescalero reservation the I.G. reported:

● During fiscal years 1980 through 1989, the Bureau did not offer for sale the full annual allowable timber cuts that the Mescalero Apache desired to sell.

● The full annual allowable timber cuts were not offered for sale by the Mescalero agency because the Bureau did not effectively manage the timber sales program.

● As a result, about $5.3 million in potential gross timber sales revenues (based on the average annual sales price) was not received by the Mescalero Apache Tribe.

● Additional money was lost to reduced timber growth and increased timber mortality because mature slow growing and decaying timber was not harvested and replaced by vigorous stands of young timber.

● The Mescalero Apache Tribe desired to sell the full annual allowable timber cuts that were calculated by the BIA.

The timber sales shortfalls occurred because: (1) forestry personnel assigned to timber sales and to a forest inventory analysis did not have adequate training and experience; (2) timber sales staff and funds were allocated to other activities; (3) sufficient personnel resources were not assigned to timber sales; and (4) forestry supervisors did not monitor performance of their staff and did not effectively communicate with their respective tribes, their staff, and each other.

Testimony at trial confirmed that BIA personnel participated in preparation of the I.G. report. The BIA Acting Forest Manager on the Mescalero Forest had input to the I.G. Audit Report. The BIA Area Forester for the Albuquerque area provided annual reports used in the I.G. Audit Report. The BIA Area Forester for the Albuquerque area agreed that the Mescalero Apache Tribe desired to sell the full AAC during the 1979 FMP period as reflected in the I.G. Audit Report.

The record made at trial supports the conclusions in the I.G. audit report. The BIA did not effectively manage the Tribe's timber sales program during the 1979–1988 cutting period.

█ Although plaintiff has prevailed on the mismanagement contention in the trial

limited to liability issues, substantial problems affect measurement of damages due to mismanagement of the Tribe's timber resources. These problems concern (1) the degree that the Tribe was unaware of potential mismanagement under the 1979 FMP; (2) procedures for accounting for revenues from Tribal enterprises; and (3) the extent and effect of hardship to Tribal financial conditions resulting from BIA mismanagement in the 1979–1988 period.

There is support in the record for the Tribe's assertion that publication of the 1991 I.G. report was the first time it became aware of BIA mismanagement during the 1979–1988 period. In derogation of this assertion is the fact that the Tribe had sufficient information to authorize in 1997 institution of a suit for timber mismanagement covering the period 1946 to March 8, 1979, and the recovery by settlement of $1,646,500 on August 28, 1984. There is also Myron Wall's final report on January 8, 1982, of the BIA draft of the 1979 FMP, and the subsequent reduction of the AAC in the final 1979 FMP used by BIA.

Different accounting procedures apply to Tribal government revenues than apply to accounting for Trial enterprises. The Tribe's chief financial officer described these as follows:

> The Mescalero Apache Tribe maintains its accounting records in accordance with Generally Accepted Accounting Principles as it applies to its [Tribal] Enterprise operations, and to Government Generally Accepted Accounting Principles as it applies to the Tribal Government operations.

> The Tribal Government applies all applicable Governmental Accounting Standards Board (GASB) pronouncements, and the Enterprises apply all applicable Financial Accounting Standards Board (FASB) pronouncements and Accounting Principles Board (APB) opinions issued on or before November 30, 1989. These Boards are the primary standard setting bodies for Generally Accepted Accounting Principles, and both Boards are subject to oversight review by the Financial Accounting Foundation.

As a result of these accounting procedures, determination of the revenues, profitability of Tribal enterprises, sources of Tribal government revenues, and revenues from timber operations, as reflected in the documentation and testimony presented at trial on the liability issue, is difficult and subject to unnecessary confusion.

During the period 1920–1988 substantial change occurred relative to sources of Tribal income. Income attributable to forest management became much less in proportion to income from Tribal enterprises. During the period 1979–1988 the Tribe's total financial position appears to reduce to some extent any financial hardship that results from BIA's mismanagement. Related to the extent of resulting hardship is the question of relevance or lack of relevance of income from Tribal enterprises to reduction of income from mismanagement of timber property.

### CONCLUSION

On the basis of the foregoing and the record made at trial:

IT IS ORDERED:

(1) Defendant's motion for summary judgment on the record that was available at oral argument on July 21, 1993, is DENIED.

(2) Defendant's motion for judgment pursuant to RCFC 52(c) on the record in existence at the close of plaintiff's case on December 16, 1996, is DENIED.

(3) On or before March 26, 1999, the parties shall file a joint report on the status of negotiations to settle the issue of damages.

(4) If required, procedures applicable to trial of damages issues will be established by separate order.

### ATTACHMENT A

No. 92–403L

(Filed: July 23, 1993)

The Apache Tribe Of The Mescalero Reservation, Plaintiff,

v.

The United States, Defendant.

### ORDER

#### After Oral Argument

Pursuant to order, oral argument was heard on July 21, 1993, in the United States

Court of Federal Claims, National Courts Building, Washington, D.C.

*Appearances*

For Plaintiff: **Gregory M. Quinlan, Esq.**

For Defendant: **Glen R. Goodsell, Esq.**

*Relevant Papers*

Petition [Complaint], filed June 15, 1992;

Answer, filed September 11, 1992;

Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, with Memorandum in Support and Exhibits Nos. 1 through 8, filed October 27, 1992;

Defendant's Proposed Findings of Uncontroverted Fact, filed October 27, 1992;

Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, with Statement of Genuine Issues, Additional Findings of Uncontroverted Facts, and Exhibits Nos. 1 through 7, filed January 26, 1993;

Defendant's Reply Brief, filed February 25, 1993;

Defendant's Statement of Genuine Issues, filed March 2, 1993;

Plaintiff's Response to Defendant's Reply Brief, filed May 18, 1993;

Defendant's Reply to Plaintiff's Response to Defendant's Reply Brief, filed May 25, 1993.

Plaintiff is a recognized tribe of Indians, organized under 25 U.S.C. § 476. The complaint alleges breach of fiduciary responsibility in managing and marketing the tribe's timber located on the Mescalero reservation. The complaint states a claim within the subject matter jurisdiction of this court. 28 U.S.C. §§ 1491 & 1505; *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Accordingly, defendant's motion to dismiss on the pleadings under RCFC 12(b)(1) must be denied. Defendant's motion to dismiss, treated as a motion under RCFC 12(b)(4), failure to state a claim on which relief can be granted, is converted to one for summary judgment because matters outside the pleadings are presented to the court and are not excluded.

For reasons stated during argument, the materials presented before the court are not adequate to permit resolution of plaintiff's claims by summary judgment procedures. The motion papers make it clear numerous genuine issues of material fact are in dispute. Summary judgment is appropriate only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Adickes v. S.H. Kress,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Plaintiff's forest is managed by the BIA pursuant to a BIA generated forest management plan (FMP). The tribe has not contracted forestry functions under ISDEA, 25 U.S.C. §§ 450–450(n) (1988). There is no dispute that defendant has the duty of a fiduciary to properly and prudently manage the timber resources on a sustained yield basis. Plaintiff has the burden to show defendant's actions have resulted in such a breach of fiduciary responsibilities that defendant is financially liable to compensate for damages sustained as a result of breach of duty as a trustee. To prevail, plaintiff's proof must make such a showing. After a determination that defendant's conduct constitutes a failure of duties as a trustee, determination of the amount of monetary compensation, including such procedures as appropriate for such determination, will be in order.

Mismanagement of Mescalero timber resources that plaintiff alleges amounts to compensable breaches of fiduciary duties include: (1) undercutting of timber, (2) application of unsound silvicultural principles relative to timber growth and timber mortality, (3) insect infestation and disease, (4) misuse of administrative funds, and (5) failure to enforce contract provisions relative to Indian labor preference. These allegations, if proven, could be compensable under the continuing claim doctrine.

The 6 year statute of limitations period prescribed by § 2501 applies to Indian tribal claims "in the same manner as against any other litigant seeking legal redress or relief from the government." *Hopland Band of*

*Pomo Indians v. United States,* 855 F.2d 1573, 1576 (Fed.Cir.1988). The statute of limitations is a jurisdictional requirement conditioning the government's waiver of sovereign immunity, thus it must be strictly construed. *Jones v. United States,* 801 F.2d 1334, 1335 (Fed.Cir.1986). Exceptions to section 2501 are not to be implied. *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957).

A claim first accrues "when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland,* 855 F.2d at 1577. Where the government fraudulently or deliberately conceals material facts, or such facts are inherently unknowable, the statute of limitations shall be tolled. *Welcker v. United States,* 752 F.2d 1577, 1580 (Fed. Cir.1985) *cert. denied,* 474 U.S. 826, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985); *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 720 (Fed.Cir.1984). The Federal Circuit has held that section 2501 is "not tolled by the Indians' ignorance of their legal rights." *Menominee,* 726 F.2d at 720–21.

The continuing claims doctrine was evolved by the Court of Claims for application of the statute of limitations. *See generally, Friedman v. United States,* 159 Ct.Cl. 1, 310 F.2d 381, 385 (1962), *cert. denied,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963); *Acker v. United States,* 23 Cl.Ct. 803 (1991). The doctrine holds that if the government owes a continuing duty, a new cause of action arises each time the government breaches that duty. *Mitchell v. United States,* 10 Cl.Ct. 63, 75, *modified on reh'g,* 10 Cl.Ct. 787 (1986). Under the continuing claims doctrine, plaintiffs can sue only for those wrongs which have occurred within the 6 year statutory period. *Id.*

The continuing claims doctrine permits plaintiff to proceed on claims that accrued after June 15, 1986. Under statutes, regulations, and forest management plans, the government clearly had a continuing duty to manage plaintiff's timber resources. *Mitchell,* 463 U.S. at 224, 103 S.Ct. 2961. Managing the forest lands included protecting, harvesting and selling the timber, reforestation,

and administrating all aspects of the program. *See* 25 C.F.R. § 163. These duties are not isolated projects, but rather are year-in and year-out, continuing responsibilities. For example, each year the government schedules and harvests a certain amount of timber on the behalf of the Tribe.

In this action, plaintiff is not barred by the statute of limitations from recovering for wrongs occurring after June 15, 1986. The continuing claims doctrine prevents the Defendant from escaping all liability, while preserving the purpose of the 6 year limitations period. *Mitchell,* 10 Cl.Ct. at 75.

The complaint contains a general claim for continuing mismanagement of the timber resources from March 9, 1979, to the present. Plaintiff recognizes that a previous timber mismanagement claim was made in the Claims Court docket No. 89–79L, filed March 8, 1979, and that judgment was entered on August 28, 1984, pursuant to stipulation that paid plaintiff $1,646,500. That settlement applies to all claims of both parties relative to mismanagement of timber resources for a period from August 13, 1946, to the date of entry of judgment on August 28, 1984.

It may be that plaintiff will prove mismanagement after June 15, 1986, based on the ten year cutting budget applicable to the 1979–99 period. If so, monetary damages would be limited to damages incurred after August 28, 1984, with respect to claims in existence after June 15, 1986.

The 1984 stipulation settling the previous litigation between the parties does not bar plaintiff from recovering damages in the current action. Res judicata, commonly referred to as claim preclusion, provides that when a court of competent jurisdiction enters a final judgment on the merits of an action, the parties are barred from bringing a subsequent suit based on the same cause of action. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). Claim preclusion prevents relitigation of all claims that were actually litigated as well as claims that could have been litigated. *Id.* "A judgment based on a compromise is not res judicata as to an action for a later period. . . ." *Clark v. United States,* 150 Ct.Cl. 470, 281 F.2d 443, 446 (1960).

In the previous action no claims were ever "actually litigated." The requirement that claims be "actually litigated" before claim preclusion will apply is essential to the doctrine. Without a chance to actually litigate a specific claim, a party against which res judicata is asserted is denied a fundamental rationale underlying claim preclusion—fairness. *See* Restatement (Second) of Judgments § 19 cmt. a (1982).

The 1984 stipulation prevented the parties from actually litigating the claims currently before this court. The stipulation itself states, "[t]he judgment entered pursuant to this stipulation shall be way of compromise and settlement and shall not be construed as an admission for the purpose of precedent or argument in this or any other case."

For the reasons stated during and at the close of argument:

IT IS ORDERED:

1. Defendant's motion to dismiss under Rule 12(b) is denied.

2. Genuine issues of material fact preclude determination of any of plaintiff's claims by summary judgment at this time. Accordingly, defendant's motion for summary judgment is denied without prejudice.

3. Further proceedings will be pursuant to RCFC Appendix G. The Joint Preliminary Status Report required by paragraph 3 shall be filed on or before 60 days from the date of this order. Particular attention is to be given to delineation of relevant issues under subparagraph (h). Dispositive motions under subparagraph (g) may be filed only if relevant material facts are stipulated fully.