DAVIS, Circuit Judge.
 

 Stanford Monroe Welcker appeals from a decision of the United States Claims Court, H. Robert Mayer, Judge, granting the Government’s motion for summary judgment. Appellant seeks,
 
 inter alia,
 
 an award of back pay under the Tucker Act for his allegedly wrongful discharge from civilian employment with the Air Force in 1950. The court ruled that appellant’s case, filed in 1982, was barred by the six-year statute of limitations on suits brought under the Tucker Act. 28 U.S.C. § 2501 (1982). We affirm.
 

 I
 

 For the purposes of this motion for summary judgment, the Government does not take issue with appellant’s version of the hard facts, which is as follows:
 

 Following a tour with the Navy during World War II, appellant worked as a civilian draftsman in the Air Force’s Watson Laboratories in Monmouth, New Jersey. Appellant maintains that, in 1944, an FBI agent and an Army Intelligence officer approached appellant and asked him if he would infiltrate and report on the activities of the Walt Whitman Club, a community
 
 *1579
 
 organization suspected of supporting communist activities. Appellant states that he agreed, and attended a number of club meetings at the local YMCA.
 

 In 1949, the Air Force informed appellant that he was suspended for disloyalty to the Government pursuant to Public Law 77-808.
 
 [1]
 
 Welcker obtained counsel, and appealed the decision to the Laboratory’s loyalty-security board. While the case was pending, appellant’s attorney sent a letter to then-FBI Director J. Edgar Hoover, requesting that the FBI confirm that appellant’s participation in the Walt Whitman Club was at the behest of the Government. Hoover referred the matter to the main Justice Department. The Attorney General’s office responded to appellant’s counsel (in September 1949) by denying that the Government had recruited appellant as an informant. The Government claimed that appellant was already a member of the Walt Whitman Club at the time of his interview with the FBI agent and Army Intelligence officer. According to the Government’s letter, a third, unnamed individual “interested in Mr. Welcker’s welfare” had suggested that the FBI interview appellant in an effort to persuade him to leave the communist fold. The Justice Department’s letter added that “Mr. Welcker never made any report either written or oral, and when questioned regarding specific matters his answers were either evasive or erroneous.” .
 

 The loyalty-security board held a hearing late in 1949, but refused to allow appellant either to examine the reports of the FBI investigation or to cross-examine Government witnesses. At the hearing, in response to questions from his attorney, appellant related his view of the events surrounding his participation in the Walt Whitman Club’s activities, and denied being a communist. The loyalty-security board concluded that appellant was not disloyal; the board recommended, however, that the Air Force dismiss appellant in the interest of national security. In 1950, after another hearing, the Air Force Central Loyalty-Security Board affirmed this determination, as did the Secretary of the Air Force, thereby converting appellant’s suspension into a permanent termination. Appellant instituted no legal action at that time.
 

 In 1979, after Congress passed the Privacy Act (5 U.S.C. § 552a), appellant requested a copy of his FBI files. The FBI provided portions of these files in 1981. According to appellant, the documents demonstrate that the FBI and the Justice Department purposely withheld from the Air Force their true role surrounding appellant’s participation in the Walt Whitman Club. Moreover, it is asserted that the FBI failed to inform the Air Force that agents observing the club’s members often failed to distinguish between those entering the YMCA for club meetings and those entering for other purposes, including meetings of the union representing appellant and
 
 *1580
 
 other government employees. The entire thrust of the materials, says appellant, shows that the FBI, in
 
 ex parte
 
 communications to the Air Force loyalty-security board, falsified its reports of appellant’s activities, a state of affairs which appellant says he discovered only in 1981 when the FBI released his files.
 

 The Claims Court ruled that, on the basis of the undisputed facts, appellant should have been aware of the FBI’s alleged duplicity at the time of the loyalty-security board hearings themselves (1949-1950), at which the Air Force informed appellant that the FBI disputed his version of the story. The court pointed particularly to appellant’s Privacy Act request as evidence that appellant had pieced together his view of the FBI’s actions long before appellant saw his file. In his request, appellant stated:
 

 The tenor of the questions put to me by the members of the loyalty-security board indicated that the reports filed by Hughes and Allen [the FBI and Army Intelligence agents] were at substantial variance from my sworn testimony____ I infer from the various board members’ questions that Hughes and/or Allen destroyed some of the informant reports I provided them, and substituted fabricated accounts of my activities. These were designed to convey the impression that I was concealing useful information and providing false information as to the left-wing activities they had asked me to monitor.
 

 Since appellant suspected that he had been discharged on fabricated evidence approximately thirty-one years before bringing this suit, the court ruled that plaintiff’s action was time-barred on the authority of
 
 Braude v. United States,
 
 218 Ct.Cl. 270, 585 F.2d 1049 (1978), discussed
 
 infra.
 

 II
 

 Welcker concedes that actions under the Tucker Act are subject to a six-year statute of limitations, but relies on the rule that “the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim.”
 
 Japanese War Notes Claimants Association v. United States,
 
 178 Ct.Cl. 630, 373 F.2d 356, 358-59 (1967),
 
 cert. denied,
 
 390 U.S. 975, 88 S.Ct. 466, 19 L.Ed.2d 461 (1968). As a judicial interpretation of a legislative enactment, the rule is strictly and narrowly applied: “Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was ‘inherently unknowable’ at the accrual date.”
 
 Id.
 
 at 359 (footnote omitted). Appellant argues that he could not have known of the FBI’s actions prior to passage of the Privacy Act and the submission of his request under that legislation.
 

 The undisputed facts squarely belie that contention. The letter his then attorney received from the Department of Justice in 1949 plainly shows that the Government denied that appellant was a Government informant or supplied any useful information, and appellant’s own 1979 statement (quoted
 
 supra)
 
 asking for his files demonstrates that at the time of the 1949-1950 hearings he already thought that (1) the FBI reports were very different from his own views of what had occurred and (2) the FBI reports had been fabricated against him. Clearly, appellant was aware in 1949-1950 that he had been dismissed from the federal service on grounds that he himself considered to be wrong and improper.
 

 This was enough to start the running of the six-year span of limitations. Cases from our predecessor court and other circuits firmly establish that the statute of limitations is tolled only so long as the plaintiff is unaware of the wrong committed. “Defendant is not required to wait until plaintiff has started substantiating his claims by the discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run.”
 
 Japanese War Notes Claimants Association, supra.
 

 In
 
 Braude, supra,
 
 the Government summarily dismissed plaintiff from her position
 
 *1581
 
 in 1951 pursuant to a loyalty-security program similar to the one under which appellant lost his job. The Government informed petitioner at the time that her dismissal was due to a reduction-in-force. Plaintiff finally confirmed the true reason for her dismissal in 1974 after requesting and examining her employment filed under the Privacy Act. The court ruled, however, that certain clues plaintiff received should have put her on notice as to the true cause of her dismissal:
 

 And so it becomes clear, and we conclude, that the evidence before us establishes, as a matter of law, that the statute of limitations began to run as plaintiff acquired information and evidence which should have, and in the eyes of the law did, place her upon inquiry, prior to September 12, 1971 [six years prior to her filing of the complaint], that she had a potential claim. This holds true notwithstanding plaintiff’s contention that she did not have enough evidence to prove or substantiate her claim; for, just as plaintiff used the Privacy Act in 1974 as a means of acquiring the evidence needed to substantiate her alleged claim, she could have filed her suit here and availed herself of the broad discovery powers afforded by this court to its litigants, and thereby have acquired the same evidence to prove her claim within the time allowed by the statute of limitations.
 

 585 F.2d at 1054. In the instant case, appellant knew the real reason for and the circumstances surrounding his dismissal at the time of the loyalty-security board hearings; he believed, for example, that the FBI had, in his eyes, lied as to his role of Government informant. As a matter of law, appellant at that time had sufficient notice of his potential claim to commence the running of the statute of limitations.
 
 [2]
 

 Recognizing his dilemma, appellant seeks to minimize the significance of the hearings. He argues that he never
 
 knew
 
 the FBI had in effect conducted a campaign against him until he saw his file in 1981. Until then, he merely presumed that the loyalty-security boards had chosen not to believe his explanations. Appellant’s Privacy Act request, discussed
 
 supra,
 
 tends directly against this contention. Moreover, even granting the inference that appellant suggests, his explanation is not sufficient to warrant tolling of limitations.
 

 In
 
 Sandutch v. Muroski,
 
 684 F.2d 252 (3d Cir.1982)
 
 (per
 
 curiam), plaintiff charged defendant-law enforcement officials with conspiring to violate his constitutional rights by obtaining false testimony against him through duress. The defendants pleaded that the statute of limitations had run. To the plaintiff’s response that he had only recently discovered the details of the conspiracy, the court answered:
 

 We hold, however, that the record establishes, as a matter of law, that Sandutch had reason to know of the alleged conspiracy to secure false testimony as early as 1976, when he knew of [the witness’] recantation____ Although at that time Sandutch may not have known all the facts necessary to establish that the defendants conspired to deprive him of his rights,
 
 his 1976 knowledge of the falsity of [the witness’] statement obtained under duress should have led, by the exercise of due diligence, to the awareness that he had a cause of action.
 
 The statute began to run then.
 

 Id.
 
 at 254 (emphasis added). Similarly, appellant cannot escape the fact that he strongly suspected in 1949-1950 that the FBI had lied in its reports to the Air Force. His wrongful discharge claim under the Tucker Act accrued at the time he became aware of the difference between his position and the FBI’s — in 1949-1950.
 

 Ill
 

 Appellant’s primary argument on appeal is that the Claims Court miscon
 
 *1582
 
 strued the nature of his case. His cause of action, he says, is based, not on the wrongful discharge
 
 per se,
 
 but rather on the alleged impermissible
 
 ex parte
 
 communications from the FBI to the Air Force at the time of the hearings. Appellant argues that, though he was aware of the existence of an FBI report to the Air Force at the time of the loyalty-security board hearings, he did not know that the FBI had (as he puts it) determined to take an adversarial or prosecutorial role in the proceedings. He thus claims to fit under the rule suspending limitations.
 

 There are two reasons why this position cannot be accepted. The first is that appellant’s claim against the Government under the Tucker Act cannot be for a tort but must be because he was allegedly or improperly removed from his job. That claim of an illegal or improper removal he already knew he had by 1949-1950 when he knew the FBI’s position was contrary to his and he believed that that agency had fabricated evidence. That was enough to file suit. Because 28 U.S.C. § 2501 commences the Tucker Act’s six-year limitations span when the “claim
 
 first
 
 accrues” (emphasis added), it is irrelevant for limitations purposes that Welcker may not have learned until later that he had
 
 further
 
 support for that same claim of an illegal or improper removal,
 
 i.e.,
 
 that the FBI had allegedly also engaged in
 
 ex parte
 
 contacts.
 

 The other reason for rejecting appellant’s argument on alleged
 
 ex parte
 
 communications is that, in any event, the rule against such contacts is inapplicable to this loyalty-security case. The principal precedent for this court’s sustaining a claim of impermissible
 
 ex parte
 
 communications during an administrative proceeding is
 
 Camero v. United States,
 
 170 Ct.Cl. 490, 345 F.2d 798 (1965), and 179 Ct.Cl. 520, 375 F.2d 777, 780 (1967). In that case, plaintiff was removed from his position as a civilian Army employee at a supply depot in Philadelphia after the Government charged him with falsely certifying travel vouchers and receiving bribes from contractors. A grievance committee investigated the charges and moderated the penalty. The depot commander, the ultimate deciding official, solicited comments from, among others, the Army attorney who had prosecuted the case before the grievance committee. He then reinstated the harsher penalty. The Court of Claims awarded plaintiff back pay on the ground that the commander acted improperly in soliciting the attorney’s comments.
 

 The ground on which the court rested its holding in
 
 Camero
 
 was not, as plaintiff argues, that
 
 ex parte
 
 communications between an adverse Government agency and an administrative tribunal are always
 
 per se
 
 improper. Rather, the court ruled that by seeking the advice of an adverse party the decision maker had violated applicable regulations. “[Plaintiff’s motion raises serious questions as to whether his dismissal was in compliance with the regulations governing army grievance proceedings. Clearly, the army was bound to comply with its own regulations.” 345 F.2d at 805 and (in the second decision):
 

 The problem is, however, that both decisions were made, at least in part, on the basis of the
 
 ex parte
 
 communication of the opinion of Kostos, who certainly, albeit perhaps not consciously, had as an adversary more than a neutral stake in the final outcome of plaintiff’s case. This is enough to require us to invalidate plaintiff’s removal
 
 as being in violation of the regulations governing the Army grievance proceedings.
 

 375 F.2d at 780 (1967) (emphasis added).
 
 See also Jarett v. United States,
 
 195 Ct.Cl. 320, 451 F.2d 623, 629 (Ct.Cl.1971) (“It cannot be disputed that because the procedure used in this case was not pursuant to the agency’s own regulations the action taken cannot stand”);
 
 Ryder v. United States,
 
 218 Ct.Cl. 289, 585 F.2d 482, 486-87 (1978) (trial-type hearing under Army grievance procedure);
 
 compare Grover v. United States,
 
 200 Ct.Cl. 337, 350 (1973) (“Both
 
 Camero
 
 and
 
 Jarett
 
 involved regulations which called for evidentiary-type hearings [not available in this case]”). The sum of it is that, in the
 
 Camero
 
 -type cases, the stat
 
 *1583
 
 ute, regulations, or practice precluded
 
 ex parte
 
 adversarial contacts.
 
 [3]
 

 In stark contrast, appellant enjoyed the benefit of no such statute, regulations or practice under Public Law 77-808. He recognizes as much when he refers in his brief to the “modest procedural protections available to him under the statute.” It is well-known that persons charged under that statute had, as its text indicates, no right to be confronted with the evidence against them or to have a trial-type hearing; rather, the hearing was very much truncated. In the only reported case discussing the procedural protections available under Public Law 77-808, the court ruled that plaintiffs had no right to an open, trial-type proceeding.
 
 Deak v. Pace,
 
 185 F.2d 997 (D.C.Cir.1950). That court held that employees discharged under Public Law 77-808 were entitled only to “information sufficient to inform [them] with reasonable certainty and precision of the cause for removal.”
 
 Id.
 
 at 999. The court rejected the plaintiffs’ argument that the Government must disclose the entire record:
 

 But the statutes on which appellants rely gives them no such right. The most it authorizes the court to require is that the Secretary furnish the additional information so that appellants will be fully informed; receive and consider from each appellant such statement and affidavits as either may submit, and thereupon, on the basis of all the facts and circumstances before him, determine whether appellant should be “retained” and not removed from her position.
 

 Id.
 
 at 1000.
 

 Rather than the full hearing available to plaintiffs in
 
 Camero, Jarett,
 
 and
 
 Ryder, Deak
 
 establishes that appellant’s hearing was merely an opportunity for him to state his case.
 
 See Grover, supra.
 
 Given the absence in the statute, Air Force regulations, or practice of any greater procedural protections, appellant in this case cannot base his right to recover on the Government’s breach of a legal obligation to provide an open forum for his appeal.
 

 IV
 

 Appellant argues that, even if he was fully aware of the FBI’s alleged conduct at the time, the tenor of the times rendered any protest to the courts an exercise in futility and he should therefore not be penalized for his delay. But the statute of limitations is not tolled by litigative timidity.
 
 [4]
 
 At least two Supreme Court cases from the middle and late 1950’s, in which the Court dealt with administrative schemes comparable to those established under Public Law 77-808
 
 (Peters v. Hobby,
 
 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955);
 
 Greene v. McElroy,
 
 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)), demonstrate that the courts in the 1950’s were open to examine critically cases charging the Government with abuses designed to rid the Government ranks improperly of alleged “security risks.” The decision granting the Government’s motion for summary judgment is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Pub.Law No. 77-808, 56 Stat. 1053 (1942), states in pertinent part:
 

 SEC. 3 The provisions of section 6 of the Act of August 24, 1912 (37 Stat. 555; U.S.C., title 5, sec. 652) [pertaining to procedures for the removal of Government employees], shall not apply to any civil-service employee of the War or Navy Departments or of the Coast Guard, or their field services, whose immediate removal is, in the opinion of the Secretary concerned warranted by the demands of national security, but nothing herein shall be construed to repeal, modify, or suspend the proviso in that section. Those persons summarily removed under the authority of this section may, if in the opinion of the Secretary concerned, subsequent investigation so warrants, be reinstated, and if so reinstated may, in the discretion of the Secretary concerned, be allowed compensation for all or any part of the period of such removal in an amount not to exceed the difference between the amount such person would normally have earned during the period of such removal, at the rate he was receiving on the date of removal, and the interim net earnings of such person:
 
 Provided,
 
 That within thirty days after such removal any such person shall have an opportunity personally to appear before the official designated by the Secretary concerned and be fully informed of the reasons for such removal, and to submit, within thirty days thereafter, such statement or affidavits, or both, as he may desire to show why he should be retained and not removed.
 

 This statute has been repealed. Pub.Law No. 81-733, § 4, 64 Stat. 477 (1950).
 

 [2]
 

 . Braude
 
 is
 
 a fortiori
 
 to the present case because in
 
 Braude
 
 a substantial argument could be made that that employee never knew (until years later) that she had been dismissed on loyalty-security grounds. Appellant, in contrast, knew at the time that he had been removed on those very grounds, grounds he deemed to be false.
 

 [3]
 

 . In one case reversing a dismissal on the ground of
 
 ex parte
 
 communications,
 
 Sullivan v. Dept. of the Navy,
 
 720 F.2d 1266 (Fed.Cir.1983), the court made no mention of particular regulations violated by the misconduct. The court did, however, specifically quote the language in
 
 Camero
 
 which is set forth
 
 supra,
 
 and evidently believed that the whole structure of that employee-removal system precluded such communications.
 

 [4]
 

 . We note that, at the loyalty-security board hearing, appellant’s then attorney eloquently and forcefully objected to the constitutionality of the proceedings on various grounds. The record reveals no reason why he did not pursue his legal rights in a timely fashion.