**ENERGY SECURITY OF AMERICA CORP. and Albert Calderon, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 08–373C.

United States Court of Federal Claims.

Feb. 27, 2009.

Reina A. Calderon, Vice President and General Counsel, Energy Security of America Corp., Bowling Green, OH, for plaintiffs.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Divison, United States Department of Justice, Washington, DC, with whom was Gregory G. Katsas, Assistant Attorney General, Director Jeanne E. Davidson, and Assistant Director Mark A. Melnick, for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiffs, Energy Security of America Corporation and Albert Calderon, allege that actions and inactions of the Department of Energy ("DOE") have effected a Fifth Amendment taking without just compensation of two patents they hold. The case is currently before the court on defendant's motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Rules of the United States Court of Federal Claims ("RCFC"). Defendant argues that plaintiffs' claim is either barred by the statute of limitations, 28 U.S.C. § 2501 (2000), or that it fails as a matter of law to state a claim upon which relief may be granted. Plaintiffs respond that the claim is not untimely because its accrual in 1993 was inherently unknowable and that, while their claim is one of first impression, it nevertheless states a valid cause of action.

The matter is fully briefed, and oral argument was held on February 3, 2009. For the following reasons, we conclude that the complaint is untimely but that even if it were not, it does not state a valid cause of action.

## BACKGROUND [1]

Plaintiffs own certain patent [2] rights referred to collectively as "the Calderon Pro-

---

1. Pursuant to RCFC 12(b)(1) and 12(b)(6), we assume the facts alleged in the complaint to be correct.

2. United States Patent No. 4,927,430 (the '430 patent) and United States Patent No. 5,063,732 (the '732 patent).

cess for Synthetic Gasoline and power Co–Production," or simply herein as "the Calderon process." Plaintiffs contend that the Calderon process "is commercially valuable as a method of producing synthetic gasoline and electric power from coal, and is suited for installation in existing coal-fired power plants." Cmpl. ¶ 5. They assert the Calderon process is so useful that if all coal plants employed their technology, the United States would produce enough synthetic gasoline to make up for 35% of all oil imports and substantially reduce emissions from coal-fired plants.

The complaint lays out in great detail a long relationship that plaintiffs have had with DOE concerning the Calderon process. The relationship is the coincidence of two phenomena: plaintiffs' own the rights to a means of coal gasification based on the Calderon process, and DOE has for decades been encouraging and funding research into coal gasification. Plaintiffs, and others, have received millions of dollars from DOE as the agency has explored the theoretical and practical aspects of coal gasification. The primary funding mechanism for this government research support has been the Clean Coal Technology Demonstration Program ("CCTDP").

DOE issued five solicitations for the CCTDP between 1986 and 1992. Plaintiffs responded to each of the solicitations. These clean coal technology program solicitations "were geared toward the commercial-scale ... demonstration[ ] of clean coal technologies, including coal gasification technology." Id. at ¶ 199. DOE rejected all of plaintiffs' proposals.[3]

After DOE rejected their fifth proposal in 1993, plaintiffs spent the next sixteen years attempting to secure alternate means of financing their projects, including efforts to persuade various public and private power and industrial companies to invest in their technology. These efforts were unfruitful.

Plaintiffs did, however, receive two separate grants from DOE for approximately $17 million. The first was "to construct and operate a proof-of-concept Process Development Unit (PDU) in Alliance, Ohio, principally to test plaintiffs' hot gas clean-up technology." Id. at ¶ 185. This grant totaled $13.31 million and was paid from 1987 to 1992. The second, awarded in 1995, provided $3 million in funding for the development and demonstration of critical sub-systems of plaintiffs' gasification process (i.e. plaintiffs' pyrolysis and hot gas cleaning) as applied to coke making.

The essence of plaintiffs' claims is that the United States, acting through DOE, made several coordinated decisions in the 1980s and 1990s about which power sector technologies to fund, with the result that new technology introductions in the coal gasification area were "restrictively regulated." Id. at ¶ 7. Plaintiffs explain that DOE funding decisions amounted to de facto regulation because it became virtually impossible to apply innovative coal gasification technology to certain power sectors without a DOE-funded commercial-scale demonstration project.[4] As part of this policy, in the late 1980s and early 1990s, DOE determined that it would not provide funding for commercial scale demonstration projects to plaintiffs' Calderon process for Integrated Gasification Combined Cycle ("IGCC").[5] Instead, the agency elected to fund a different process, the oxygen-blown entrained-flow gasification method. These funding decisions ultimately resulted in a technology standard of oxygen-blown entrained-flow gasification being applied in the field of IGCC coal gasification. Because of DOE's actions, plaintiffs argue, this standard also has been adopted by other federal agencies, such as the EPA, making it com-

3. After DOE rejected plaintiffs' round one proposal, DOE informed the Ohio Congressional delegation that it did not consider the gasification and hot cleaning technology to be "technically feasible." Cmpl. ¶ 184.

4. This assertion seems to conflict with other allegations in the complaint that the oxygen-blown entrained-flow gasification technology was commercially demonstrated previously in "an entirely private sector-funded" project. See id. at ¶ 7.

5. IGCC is coal gasification tied to a combined cycle turbine system.

mercially impracticable to demonstrate and utilize the Calderon process.

Plaintiffs allege that it is impossible to apply their technology to a commercial coal gasification project without DOE funding for a "first-of-a-kind demonstration project at a commercial or near-commercial scale." *Id.* at ¶ 13. No "first-of-a-kind" coal gasification commercial project has ever been built in this country without direct financial support from DOE.[6] *Id.* at ¶ 14. DOE did not provide plaintiffs with funding necessary to conduct such a commercial-scale demonstration project. Instead, DOE provided funding to competing technologies, thereby rendering plaintiffs' patents and their right to exploit the patents useless. "DOE denials of demonstration project funding have the same impact upon the utilization of a gasification technology and its underlying intellectual property rights as does a permanent government denial of the right to develop land." *Id.* at ¶ 16.

DOE controls the timing of funding for commercial-scale demonstrations, loan guarantees, and tax credits to such an extent that it "is in the position·of regulating both the timing and pace of technological demonstration and commercial market entry in the coal gasification area...." *Id.* at ¶ 271. The net effect is "that it can, if it selects to, preference only technologies that have received prior DOE funding." *Id.* DOE brought about precisely this result when it adopted the oxygen-blown entrained-flow method of coal gasification as its preferred technology, despite the fact that it is an older technology than that of plaintiffs. In addition, the oxygen-blown entrained-flow method had previously been commercially demonstrated for coal gasification in a private sector-funded project, and there was thus no need for DOE to further fund that technology through the CCTDP.

Plaintiffs allege that there is further evidence that DOE uniquely and categorically excluded the Calderon process from funding consideration under the CCTDP. For instance, a provision in plaintiff's 1987 Cooper-

ative Agreement Award conditioned funding for the PDU on a commitment to commercialization of the project with "no further Federal funding after completion of this feasibility demonstration." *Id.* at ¶ 195. Plaintiffs allege that this provision reflects a DOE policy to categorically disqualify the Calderon process from commercial demonstration funding and to keep plaintiffs' process from competing within DOE's IGCC program. DOE also tried to block plaintiffs' attempts to commercially demonstrate sub-components of the Calderon process during the 1990s by attempting to deny plaintiffs a $3 million award, even after they had been chosen to receive it in 1995. In addition, DOE allegedly refused to actively obtain appropriations for and intentionally imposed a higher than usual seven per cent "administrative tax" on plaintiffs' 1999 proposed joint venture that would demonstrate and commercialize the Calderon process as applied to making blast furnace coke.

According to plaintiffs, these events further exhibit a *de facto* policy of excluding their technology from competing for federal commercial-scale demonstration funding. Plaintiffs also argue that this policy conflicted with DOE's statutory obligation to provide "small business concerns ... a reasonable opportunity to participate, insofar as is possible, fairly and equitably in grants, contracts, purchases, and other Federal activities relating to research, development, and demonstration of sources of energy efficiency." 42 U.S.C. § 5801(d) (2000).

Although some of the facts alleged concern events after 1993, plaintiffs assert that DOE's 1993 denial of plaintiffs' final CCTDP proposal is the pivotal event which devalued the patents underlying the Calderon process. DOE thereby "closed the window" on its potential commercialization at that time. *See* Cmpl. ¶ 291.

*Plaintiffs' Theory of the Case*

These facts, plaintiffs assert, constitute a regulatory taking. DOE's involvement in the coal gasification technology industry is so

---

**6.** DOE usually contributes both construction and operating costs toward such projects on a shared basis with non-federal participants. *Id.* at ¶ 14.

pervasive, according to plaintiffs, that DOE's denial of their funding requests to develop their technology led to the destruction of the commercial value of the Calderon process. Instead, DOE favored technologies different from those taught in plaintiffs' patents, despite the fact that plaintiffs' technology is far superior.

Plaintiffs argue that this regulatory taking by DOE was complete as of May 1993, when DOE rejected plaintiffs' round five proposal for the CCTDP. This is more than six years prior to May 2008, making the action presumptively time-barred, but plaintiffs argue that accrual suspension is warranted. Plaintiffs "could not possibly foresee at that time the extent to which DOE and industry would adhere to the oxygen-blown entrained-flow gasification process as defining the field of coal gasification and an evaluation of the Plaintiff's market and economic injury for its coal gasification technology was not possible until project cancellations occurred." *Id.* at ¶ 395. Accrual of a cause of action therefore should be suspended until fall 2007, because it was only then that simultaneous power industry cancellations of multiple oxygen-blown entrained-flow projects revealed the full extent of plaintiffs' damages.

### DISCUSSION

I. *Plaintiffs' Claim Falls Outside the Statute of Limitations*

■■■ Every claim of which the United States Court of Federal Claims has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. In general, "a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their exis-

tence.'" *Boling v. United States,* 220 F.3d 1365, 1370 (Fed.Cir.2000) (citing *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988)); *see also Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir.1995) (stating that "a cause of action accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action.").[7]

■■■ Plaintiffs allege a "Government action that constituted a taking starting in 1988 and which ... was completed as of May 1, 1993." Cmpl. ¶ 25. Plaintiffs rely on this date because it represents DOE's fifth and last rejection of plaintiffs' request for federal funding for its technology through the CCTDP. If this is the date of taking, then the complaint, which was filed on May 23, 2008, is plainly untimely. Although the complaint alleges a few events which occurred after May 23, 2002,[8] none are alleged to have triggered a new cause of action. Instead, plaintiffs assert that between 1993 and 2007, the accrual of their cause of action was inherently unknowable, thereby excusing the untimeliness of the complaint.

■■■ Plaintiffs rely on a narrow exception to the otherwise rigid application of the six-year limitations period articulated in *Japanese War Notes Claimants Assoc. v. United States:*

> In certain instances the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough. Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual

---

7. When this court's subject-matter jurisdiction is challenged, the non-moving party bears the burden of establishing jurisdiction. *International Industrial Park, Inc. v. United States,* 80 Fed.Cl. 522, 526 (2008). Determination of jurisdiction starts, and in this case ends, with the complaint, "which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be imposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997).

8. For example, plaintiffs note that another funding request was denied in 2005. Cmpl. ¶ 340. Also, in January 2007, plaintiffs received a letter from the Environmental Protection Agency to the effect that the agency needed additional information before it could evaluate the Calderon process. *Id.* at ¶ 355. Finally, there were cancellations of oxygen-blown entrained-flow projects due to refractory reliability issues in the fall of 2007. *Id.* at ¶¶ 396, 397.

date. An example of the latter would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit. 178 Ct.Cl. 630, 373 F.2d 356, 358–59 (1967) (citations and footnotes omitted). *See also Martinez v. United States*, 333 F.3d 1295, 1319 (Fed.Cir.2003)*(en banc)*. It is well-settled that "[t]he 'accrual suspension' rule is 'strictly and narrowly' applied: ... [plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Martinez*, 333 F.3d at 1319 (quoting *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed.Cir.1985)).

Plaintiffs anticipate this issue in the complaint. They assert that in 1993, the time of the taking, "they could not possibly foresee ... the extent to which DOE and industry would adhere to the oxygen-blown entrained-flow gasification process defining the field of coal gasification." Cmpl. ¶ 395. It would have been impossible "to predict that DOE would eventually formulate its financial assistance policies in the IGCC area to focus on the oxygen-blown entrained-flow gasification technology, as an exclusive technology standard, or that other federal agencies would also adopt this process as a de facto technical standard." *Id.* Further, plaintiffs allege that only in the autumn of 2007, when there were multiple cancellations of oxygen-blown entrained-flow projects by the power industry, were plaintiffs "in a position to be able to show that DOE's action in precluding commercial demonstration project funding damaged its property right in its ... patent[s]." *Id.* at ¶ 396. At that time, when the projects based on competing technology were cancelled, plaintiffs were in a position to ascertain or prove damages because it was not until then that the weakness of DOE's selected technologies was demonstrated. What plaintiffs argue, in effect, is that they were aware of all of DOE's actionable conduct in 1993, but they were not aware until later of its consequences.

■ The term "inherently unknowable" does not, however, refer to plaintiffs' access to proof or evidence of damages, even if the government is the party with access to the evidence. *See Welcker*, 752 F.2d at 1580 (explaining that "[d]efendant is not required to wait until plaintiff has started substantiating his claims by the discovery of evidence [to have repose provided by the statute of limitations]. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run."). Potential plaintiffs need not know of all of the economic ramifications of governmental action for the cause of action to accrue, so long as they know that there will be some sort of adverse effect. *See Mobley v. United States*, 68 Fed.Cl. 434, 438 (2005) (holding that plaintiff's taking claim accrued upon completion of the government action at issue and not when financial data became available to alert plaintiff to an economic injury and allow him to prove it).

By 1993, because of their experience with DOE and other government agencies, plaintiffs knew that government funding would be crucial to their technology's success. They also knew that funding had been repeatedly denied. Plaintiffs concede in their complaint that "[i]t is widely accepted and it has been the practice within the utility industry that first-of-a-kind commercial-scale gasification projects require federal funding support." Cmpl. ¶ 14. Plaintiffs support this statement by reference to the Federal Nonnuclear Energy Research Development Act of 1974, 42 U.S.C. §§ 5901 *et seq.* Further, plaintiffs admit that as of May 1993, they "had ample evidence that the agency did not want to fund its Process ..." Pls.' Resp. at 12. *See also* Cmpl. ¶ 292 (conceding that a DOE representative explained to plaintiffs that after the round five rejection, DOE was not interested in other coal gasification processes, other than those it had already selected under the CCTDP). Therefore, as of May 1993, plaintiffs knew that a requirement for the success of their project—government funding—would not be provided.

Plaintiffs confuse difficulty in gathering support for their claim with inherent unknowability. Plaintiffs argue that it was not until 2007 that they were in a position to show how DOE's actions damaged their property rights. But it is irrelevant when "better" evidence becomes available. In-

stead, the question is whether the plaintiffs were on inquiry notice of the fact that they had a claim. Assuming that lack of funding is actionable conduct, then, as of 1993, plaintiffs "had ample evidence that [DOE] did not want to fund its Process." Pls.' Resp. at 12. Plaintiffs not only knew of the government's denial of funding in 1993, but they also knew no later than early 1993 that the Calderon process could be implemented.[9] *See* Cmpl. ¶¶ 280–293.

■ Plaintiffs also assert that the DOE concealed the degree to which the competing technology (the oxygen-blown entrained-flow process) was subject to technical problems during the 2000s, thus impairing plaintiffs' ability to know that the Calderon process was excluded from the IGCC technology market. Plaintiffs assert that it was not until late 2007 when multiple power plants that were due to employ the competing oxygen-blown entrained-flow process suddenly cancelled contracts, that the market relevance of plaintiffs' process was demonstrated.

■ The fact that plaintiffs did not anticipate in advance the industry's response to a competing technology does not, however, constitute concealment by the government. There is no specific allegation in the complaint that the government concealed any of its pre–2002 conduct, other than the conclusory statement that DOE was a part of circumstances concealing the lack of an economically viable process technology for IGCC. But DOE certainly did not conceal the fact that it was not interested in funding plaintiffs' technology, nor did it lead plaintiffs to believe that funding would be provided.[10]

Plaintiffs concede that they knew of their loss of business opportunity after their round five proposal was rejected in 1993. The only thing that the 2007 power industry cancellations demonstrate is that perhaps plaintiffs were correct that their technology is superior to oxygen-blown entrained-flow coal gasification, and, in retrospect, perhaps it would have been wiser for DOE to invest in the Calderon process. However, the possibility that DOE's chosen technology was faulty does not equate to government concealment.

Plaintiffs do not argue that the alleged superiority of their process was inherently unknowable or concealed in 1993, or that DOE policies were inherently unknowable or concealed in 1993, or that they were unaware of the necessity of DOE funding for a commercial-scale demonstration project in 1993. Because plaintiffs were, at least as early as 1993, on notice of their claim, the statute of limitations began to run at that time. It would have run its six-year course by 1999, well before this lawsuit was filed. The action is therefore untimely, and we do not have jurisdiction over it.

II. *Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted*

■ Even if plaintiffs' action was timely filed, the complaint nonetheless fails to state a claim. The complaint recites four counts: (1) a *per se* taking of their patent rights and the natural right to exploit the patents; (2) a categorical taking of the same through a complete devaluation of plaintiffs' patent rights; (3) a *Penn Central*-type regulatory taking[11] of plaintiffs' ability to commercially apply the Calderon process; and (4) an "alteration of the patent *quid pro quo.*"[12]

---

**9.** Testing at plaintiffs' Process Development Unit had shown the workability of the Calderon process in late 1992 and early 1993, according to the complaint.

**10.** In this connection, we disagree with plaintiffs about the effect of Congress' admonition that small business concerns should "be given a reasonable opportunity to participate, insofar as is possible, fairly and equitably in grants, contracts, purchases, and other Federal activities relating to research, development, and demonstration of sources of energy efficiency." *See* 42 U.S.C. § 5801(d) (2000). We view this as precatory

language, at best. It does not constitute a promise of funding.

**11.** *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

**12.** Categories (1) and (2) we view to be fundamentally the same—a *Lucas*-type regulatory taking of all value. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The last category we take to be a species of either a *Lucas* or a *Penn Central* taking, namely a taking of intellectual property when the promised exclusivity is not

Plaintiffs essentially claim that the government took their patent rights and the "natural right to exploit" the patents by making it commercially impossible or impracticable for plaintiffs to get their process on the market. This is because the viability of IGCC technology cannot be demonstrated without DOE funding.

The complaint alleges that, because the Federal Circuit has in some cases found that personal property can be subject to a *per se* takings analysis and, because patents are personal property, then patents can be subject to a *per se* takings analysis. Plaintiffs assert that, because a patent involves disclosing a trade secret to the government in exchange for a temporary monopoly on the invention, then if the government precludes any commercial application of the patented invention, the government has *per se* taken the patent because the temporary monopoly has become worthless to the owner.

■ Plaintiffs do not claim a property interest in the award of the government contracts.[13] *See id.* at ¶ 55. Nor do they contend an infringement of their patents.

A RCFC 12(b)(6) motion to dismiss calls on the court to determine if the factual allegations are enough to raise the right to relief above the level of speculation. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). "The Court does not weigh the evidence or determine the likelihood of a plaintiff ultimately prevailing in a Rule 12(b)(6) motion, but rather assesses whether a plaintiff has alleged facts, which if proven, would entitle it to the relief sought." *L–3 Communications Integrated Systems, L.P. v. United States,* 79 Fed.Cl. 453, 455 (2007). In short, we give the complaint the benefit of any doubt. In

this case, however, doing so does not rescue the complaint.

In pertinent part, the Fifth Amendment states, "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V, cl. 4. The Federal Circuit has developed a two-part test to determine whether a governmental action constitutes a taking: (1) whether a protected property interest existed, in other words, whether the property interest "was a 'stick in the bundle of property rights' acquired by the owner" and (2) if so, whether the governmental action constituted a compensable taking of that "stick." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir. 1995) (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)).

■ Assuming there is an identified property right, there are two types of regulatory takings. The first is a categorical or *per se* taking, when government regulation deprives the owner of all economically beneficial or productive use of his property. *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *see American Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1372 (Fed.Cir.2004). Otherwise, regulatory takings are subject to the standards of *Penn Central Transp. Co. v. New York City. Penn Central* did not set out a precise formula for evaluating regulatory takings but identified three primary factors: (1) the character of the government action; (2) the economic impact of the action on the owner; and (3) the extent to which the action interfered with the claimant's reasonable investment-backed expectations. *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074. Each of these three factors "aims to identify regula-

honored. Plaintiffs have not asserted that the government has infringed on their patents. Thus, the four counts are merely different ways of asserting either a *per se* or *Penn Central*-type taking.

**13.** Even if plaintiffs had asserted a property interest in the award of DOE contracts, it is settled in this court that a contractor has no Fifth Amendment-protected property right in the award of a government contract. *See OAO Corp. v. United States,* 17 Cl.Ct. 91, 105 (1989) (stating that it is "settled law that no assurance exists

that a contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations"); *Refine Construction Co., v. United States,* 12 Cl.Ct. 56, 67 (1987) (rejecting plaintiff's "premise" that it had a property right in the award of a government contract and stating that "[t]here is no property right to the award of a public contract. No citizen has a 'right' in the sense of a legal right to do business with the government.").

tory actions that are functionally equivalent to the class of taking in which government directly appropriates private property or ousts the owner from his domain" and thus "focuses directly upon the severity of the burden that government imposes upon private property rights." *Id.*

The property rights that plaintiffs assert were taken are derived from their patents in the Calderon process and their "natural right to exploit" the patents.[14] *See* Cmpl. ¶ 360 ("Plaintiffs allege that the Government's actions in this case have effected a *per se* taking of the '430 patent, the '732 patent, and the Plaintiff's natural right to exploit said patents."). A patent is certainly a property interest which plaintiffs enjoy with respect to their '430 and '732 patents. *See Florida Prepaid Postsecondary Education Expense Bd. v. College Savings Bank,* 527 U.S. 627, 642, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) ("[p]atents ... have long been considered a species of property"). A patent gives "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U.S.C. § 154(a)(1) (2000); *see Bloomer v. McQuewan,* 55 U.S. 539, 549, 14 How. 539, 14 L.Ed. 532 (1852) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented ... This is all that he obtains by the patent."). Other courts similarly define patents as "securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." *American Infra–Red Radiant Co. v. Lambert Industries, Inc.,* 360 F.2d 977, 994 (8th Cir.1966), cert. denied 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966) (quoting U.S. CONST. art. I, § 8, cl. 8). *See also Reeves Bros., Inc. v. U.S. Laminating Corp.,* 282 F.Supp. 118, 134 (E.D.N.Y. 1968), aff. 417 F.2d 869 (2d Cir.1969) (stating that "a patent has been repeatedly defined as a franchise granting the right to exclude everyone from making, using or selling the patented invention without the permission of the patentee.").

And plaintiffs are correct that the Supreme Court has applied takings analysis in the context of intangible rights, including rights in intellectual property. In *Ruckelshaus v. Monsanto,* the Court held that the fact "that intangible rights protected by state law are deserving of the protection of the Taking Clause has long been implicit in the thinking of this Court." 467 U.S. 986, 1003, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The rights protected there were trade secrets.

■ With respect specifically to patents, however, the Federal Circuit has clarified that an amendment to the patent act, now codified at 35 U.S.C. § 154 (2000), "corrected any mistaken belief that patent rights somehow hinged upon the patentee's exploitation of the invention ... a patent confers the right to exclude others from exploiting an invention. It does not confer the right to exploit the invention already possessed by the inventor." *King Instruments Corp. v. Perego,* 65 F.3d 941, 949 (Fed.Cir.1995); *see also Herman v. Youngstown Car Mfg. Co.,* 191 F. 579, 584 (6th Cir.1911) (stating that "[a] patent is not the grant of a right to make or use or sell. It does not, directly or indirectly, imply any such right. It grants only the right to exclude others."). In other words, patents convey the right of exclusivity; they do not offer any assurance that the patentee will in fact be able to make, use, or sell the invention.

■ The Federal Circuit has explained further that "collateral interests" such as "the ability to realize an expectation in the ultimate market disposition" of the property at issue are not property protected by the Fifth Amendment. *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 217 (Fed.Cir.1993). Government actions which "frustrat[e] ... business expectations [do] not form the basis of a cognizable takings claim." *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1380 (Fed.Cir.2008).

In *Huntleigh,* a contractor retained by airlines to conduct security screenings at airports brought a takings claim after Congress enacted legislation permitting only the gov-

---

**14.** The '430 patent covered the "Method of Producing and Treating Coal gases" and the '732 patent covered the "Method for Repowering Existing Electric Power Plant."

ernment to conduct security screenings. This development caused all of Huntleigh's previous airline customers to cancel their contracts or not renew them. *Id.* at 1375. The government did not assume any of the contracts at issue, but Huntleigh alleged that the government's actions resulted in a taking of his airline contracts and the goodwill and going concern value built up through his business. *Id.* Because the government had not taken over performance, the Federal Circuit rejected the argument that it had taken the contracts. *Id.* at 1379. The court further held that a claim could not be stated based on government action that rendered the contracts and associated good will and going concern worthless, because frustrated business hopes or expectations do not form the basis of any cognizable takings claim. *See id.* at 1380 (explaining that "modified governmental regulation ... which resulted in adverse economic consequences ... [and] 'frustrat[ed]' ... business expectations ... does not form the basis of a cognizable takings claim.").

Plaintiffs recognize these limitations in the prior law, but advance what they concede is a new argument, namely, that they have an inherent right to make commercial use of their intellectual property, and this right does not depend on the grant of a patent. In other words, the grant of the patent is not the four corners of plaintiffs' property interest. When that insight is applied in the takings context, plaintiffs contend that what emerges is a bona fide takings claim under either a *per se* or a *Penn Central* theory. Under the first theory, plaintiffs allege, and we have to assume for purposes of the motion, that the Calderon Process has no commercial value at all because of the government's actions. Under the second theory, they allege that the elements in the three-part *Penn Central* analysis—substantial diminution, reasonable investment backed expectations, and the type of government conduct—are sufficiently present to find a taking.

Plaintiffs have the advantage at this point that such claims are inherently fact-driven and less susceptible to dispositive motion treatment, particularly motions to dismiss. Nevertheless, we believe the claims are sufficiently flawed in conception that it is appropriate to deal with them through a motion to dismiss.

To begin with the *per se* regulatory taking claim, plaintiffs cite only *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In fairness, we do not know of any other Supreme Court decision the plaintiffs could cite as a clear example of a *per se* regulatory taking.[15] *Ruckelshaus*, 467 U.S. 986, 104 S.Ct. 2862, referred to earlier, involves intellectual property, but was viewed through the *Penn Central* lens. Indeed, it is probably the case that *Lucas* can be viewed as limited, at least heretofore, to the context of real property. Outside the context of real property, if there is any shred of plausible incident of ownership interest remaining, the Court has been reluctant to find a taking.

The best example is *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), in which the owner of an Indian artifact containing eagle feathers claimed that legislation forbidding the sale of such artifacts constituted a regulatory taking. The Court disagreed, finding that the right to exhibit the artifacts or give them away left the owner with something of value. The Court went on to state that,

> At any rate, loss of future profits-unaccompanied by any physical property restriction-provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.

*Id.* at 66, 100 S.Ct. 318. The Court emphasized that the artifacts were not confiscated or in any way physically constrained. It is

---

**15.** We would distinguish, for example, the *Nollan*-type exaction cases. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). In any event, *Nollan*, like *Lucas*, involved real property.

noteworthy that in *Lucas,* the Court distinguished *Andrus* because the claim did not involve real property. 505 U.S. at 1027–28, 112 S.Ct. 2886.

We will assume plaintiffs could demonstrate that the failure to fund resulted in a complete loss of commercial value. Nevertheless we are dealing here with personalty, and with no affirmative constraints of any kind on its use. Unlike *Lucas,* or *Andrus,* or *Nollan,* the government has done nothing to affirmatively proscribe plaintiffs' use of their property. Plaintiffs do not allege that DOE assumed title to the patents, took the right to exclude others from the patents, or infringed upon the right to sell or otherwise use the patents. Plaintiffs retained title to the '430 and '732 patents at all times and had every right to develop their technology, to raise money to implement their technology, to sell their technology, or to transfer the patent to any willing buyer or assignee. The likelihood of commercial success of these efforts is not a separate property interest subject to a taking. We are confronted with a claim of loss of profitability, never identified heretofore as a separate "stick" in the bundle of property rights. Indeed, *Andrus, Mitchell Arms,* and *Huntleigh* all suggest that profitability cannot be segregated as a compensable interest. In short, we believe the contraindications to a taking are so great that the claim fails as a matter of law.

Finally, plaintiff suggests that the complaint is offered "in conceptual reliance on an observation made by Justice Stevens in his dissenting opinion in *Eldred v. Ashcroft,* 537 U.S. 186, 226, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003)." The issue in that case was the constitutionality of the Copyright Term Extension Act (CTEA), Pub.L. 105–298, §§ 102(b) and (d), 112 Stat. 2827–2828 (amending 17 U.S.C. §§ 302, 304). That legislation had the effect of extending by twenty years the validity of existing copyrights. Plaintiffs' challenge under the Copyright Clause, U.S. CONST., art. I, § 8, cl. 8, was rejected by the Court. Justice Stevens filed a dissenting opinion. He wrote the following about the related field of patent law:

> It would be manifestly unfair if, after issuing a patent, the Government as a representative of the public sought to modify the bargain by shortening the term of the patent in order to accelerate public access to the invention. The fairness considerations that underlie the constitutional protections against *ex post facto* laws and laws impairing the obligation of contracts would presumably disable Congress from making such a retroactive change in the public's bargain with an inventor without providing compensation for the taking. Those same considerations should protect members of the public who make plans to exploit an invention as soon as it enters the public domain from a retroactive modification of the bargain that extends the term of the patent monopoly.

*Eldred,* 537 U.S. at 226, 123 S.Ct. 769.

The obvious shortcoming of this theory is that it is offered in a dissenting opinion. While we understand its appeal on fairness grounds, it cannot be relied upon as a statement of the law. In any event, we see no connection with the present facts. Nothing in the process of applying for and receiving patents would be inconsistent with DOE's refusal to award funds to develop plaintiffs' process. Plaintiffs cite no support for the proposition that part of the *quid pro quo* for obtaining a patent is the assurance that it will be commercially successful, much less that it will be supported by public funds. Certainly there is nothing in the present facts which suggests an unfair, "*ex post facto*" treatment of plaintiffs.

## CONCLUSION

For the reasons set forth herein, we conclude that plaintiffs' claims are time-barred, but that even if they were not, the action would have to be dismissed for failure to state a claim. Accordingly, defendant's motion to dismiss for lack of jurisdiction is granted. The clerk shall dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1). No costs.